## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

CARROLL BOSTON CORRELL, JR., on behalf
of himself and others similarly situated,

Plaintiff,

v.

Civil No. 3:16-cv-00467-REP

MARK R. HERRING, in his official capacity
as Attorney General of the Commonwealth
of Virginia, et al.,

Defendants.

## PLAINTIFF'S REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Offering only a cursory defense of the delegate-binding provision of Section 545(D), Defendants chiefly attack the standing of Plaintiff Carroll Boston Correll, Jr., to challenge the constitutionality of a statute that they concede regulates him directly and that they argue must be allowed to control his and other delegates' votes in order to give effect to primary votes. Defendants all but concede that Section 545(D) conflicts with and purports to override party rules requiring that delegates be allocated, by default, proportionally to the primary vote. And they simply ignore the text and history of party rules expressly authorizing each delegate to vote and to have their actual vote preferences recorded. Each one of these conflicts denies delegates their First Amendment right to associate with other delegates to participate, as authorized by party rules, "in the vital process of choosing Presidential and Vice-Presidential candidates." *Cousins v. Wigoda*, 419 U.S. 477, 489–90 (1975). That injury is concrete, imminent, and eminently redressable by enjoining enforcement of Section 545(D).

Defendants' limited arguments on the merits are squarely precluded by governing precedent—the Supreme Court did, after all, strike down a near-identical state law on the same grounds presented here in *Democratic Party of the United States v. Wisconsin ex rel. La Fol-*

*lette*, 450 U.S. 107, 125–26 (1981). Section 545(D) imposes exactly the same burden on national convention delegates' associational rights as the binding law in that case. The sole governmental interest identified by Defendants as justifying that burden—giving effect to primary votes—was not only rejected as unavailing in *Democratic Party of the United States*, but has been rejected time and again in a series of Supreme Court decisions upholding the associational rights of parties and their members. Similarly mistaken is Intervenors' argument that a decision denying a challenge to political party rules under the Twelfth Amendment, *Ray v. Blair*, somehow "destroys" First Amendment claims challenging a statute that conflicts with party rules.

Eschewing detailed discussion of the equities—it being well established that a First Amendment violation merits equitable relief—Defendants pin their hopes on laches. But laches is not a shield for future violation of the law and so does not apply to requests for prospective injunctions that require only inaction of the defendant. Even if laches potentially were applicable, Correll acted with diligence, requesting the Commonwealth's opinion on Section 545(D) on the very same day, May 25, that his claim became ripe as a practical matter and then bringing suit shortly after a Commonwealth attorney responded. Any delay does not prejudice Defendants. The only burden they identify, concerning the cost of administering the primary back in March, has nothing to do with Correll or any other delegate, who could not have brought suit until after the primary.

With the Republican National Convention convening in less than two weeks, Virginia delegates urgently need relief so that they can coordinate their Convention strategies with other delegates and work to advance their common Convention goals. Correll respectfully requests that the Court enter the requested injunction.

**Argument**

I.    **Section 545(D) Conflicts with Party Rules and Thereby Violates the First Amendment**

Defendants proceed under the incorrect assumption (at 25) that Correll asks the Court to "override" Republican Party rules. In fact, the relief that Correll seeks on behalf of himself and a putative class of Republican delegates would actually vindicate those rules against conflicting Virginia law. Section 545(D) conflicts with Republican Party rules in two respects: (1) its "winner-take-all" mandate for delegate allocation conflicts with the rules of the Republican Party of Virginia ("RPV"), as required by the rules of the Republican National Committee ("RNC"), adopting a proportional allocation of delegates; and (2) its mandate that delegates vote for the primary winner conflicts with longstanding RNC convention rules, in force since 1880, authorizing delegates to cast their ballots individually, as they see fit. Each of those conflicts imposes a burden on delegates that, according to governing Supreme Court case law, violates their First Amendment associational rights. *See Democratic Party of the United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 126 (1981) (holding that such a conflict constituted a "substantial intrusion into the associational freedom of the members of the National Party").

Defendants do not even attempt to address the first of these conflicts on the merits, and their argument regarding the second misinterprets the RNC rules, while ignoring over a century of experience under those rules.

A.    **Section 545(D) Conflicts with the Proportional Allocation of Delegates Under the Rules of the RNC and Republican Party of Virginia**

If "[t]he Commonwealth sees no conflict between the statute and the party rules," Opp. at 24 n.17, it should look again. Section 545(D)'s "winner-take-all" mandate attempts to override party rules adopting proportional allocation of delegates for early primary states, such as Virginia. This conflict is blatant and is based on facts that are not in dispute.

At times, Defendants actually concede that RNC and RPV rules provide for proportional allocation of delegates. *See* Opp. at 22. It would be difficult to argue otherwise. RNC Rules 13 through 25 govern the "Convening of the Next National Convention," including the selection and allocation of delegates. *See* Doc. 17-3 at 10. To prevent frontloading of the primary season, Rule 16(c)(2) provides that state parties conducting presidential primaries before March 15 "shall provide for the allocation of delegates on a proportional basis." *Id*. at 12. The RPV Rules, in turn, provide that "[p]rocedures concerning Conventions at which delegates and alternates to National Conventions are elected shall comply with the applicable Rules of the National Republican Party." Doc. 17-1 at 24. Accordingly, the RPV resolved to "proportionally allocate among the presidential candidates receiving votes in its March 1, 2016 Republican Presidential Primary." Doc. 17-2 at 8.

At other times, Defendants assert that there is "no conflict" between proportional allocation per RNC and RPV rules and Section 545(D)'s "winner-take-all" mandate, but provide no meaningful supportive argumentation in support of that position. Opp. at 24 n.17. Defendants do not maintain that Section 545(D) can be interpreted to permit proportional allocation as per RNC and RPV rules; to the contrary, they recognize that the statute mandates "winner-take-all" allocation under the circumstances of this case, where the RPV chose delegates through conventions. Opp. at 8 (under statute, "the party's delegates bound to the prevailing candidate for the first ballot at the party's nominating convention"). Moreover, Defendants acknowledge the fundamental conflict between the two approaches twice in their briefing. *See* Opp. at 24 (distinguishing "[w]hether the delegates are bound winner-take-all…or whether the delegates are bound proportionally…"); *id*. at 25 (distinguishing between allocation "proportionally or winner-take-all"). In short, Defendants' own factual recitation and argumentation concede the conflict that they are unwilling to simply acknowledge.

That conflict is one of constitutional significance because it burdens delegates' associational rights. Under proportional allocation, two-thirds of the putative class members

presumptively will be required by RPV and RNC rules to cast their ballots for candidates other than Mr. Trump. Verified Amend. Compl. ¶ 22. The "winner-takes-all" mandate of Section 545(D) is the very same burden—a state-law binding requirement that conflicts with party rules—that the Supreme Court in *Democratic Party of the United States* recognized as a "substantial intrusion into the associational freedom of members of the National Party." 450 U.S. at 126 (footnote omitted). Defendants' argument (at 27–28) that there is no burden at all, because the RPV chose to conduct a primary and thereby accepted any burden on its members' associational rights, is foreclosed by *Democratic Party of the United States*, where the state party not only chose to conduct a primary subjecting it to the state party law but also adopted the state-law binding provision as its own. *See* 450 U.S. at 110 n.3 (state binding law applied only to "parties participating in the presidential preference vote"); *id.* at 112–13 (state-party delegate-selection plan "incorporated the provisions of the State's open primary laws," including binding provision). Likewise, in *Cousins v. Wigoda*, the Court held that enforcement of a state delegate-selection law that had been adopted by the state party, in conflict with national party rules, violated the associational rights of a competing slate of delegates chosen consistent with national party rules. 419 U.S. 477, 480–83 (1975) (describing factual background). *See also Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 225 n.15 (1989) (rejecting argument that "a political party's consent will cure a statute that otherwise violates the First Amendment"). Here the conflict is greater, because Section 545(D) conflicts with both state and party rules.

In short, the undisputed facts demonstrate that Section 545(D) conflicts with RNC and RPV rules allocating delegates, thereby burdening those delegates' associational rights.

## B. Section 545(D) Conflicts with RNC Rules Authorizing "Conscience" Voting

The conflict between Section 545(D) and party proportional-allocation rules is a sufficient basis, in itself, to enjoin enforcement Section 545(D). In addition, Section 545(D) also conflicts with longstanding RNC rules authorizing "conscience" voting. Correll wishes to

be perfectly clear regarding the relationship between his two theories of Section 545(D)'s validity, in two respects: (1) he does not claim a freestanding right under the First Amendment for him or any other delegate in the putative class to vote their conscience when doing so would conflict with governing Convention rules; and (2) Section 545(D) is unenforceable, due to its conflict with the RNC's and RPV's proportional-allocation rules, irrespective of whether the Court finds that RNC rules authorize "conscience" voting by delegates. That said, Defendants' argument (at 20–24) that RNC Convention rules, rather than Section 545(D), deny delegates the ability to vote their conscience contradicts what those rules actually say and how they have been interpreted and applied for more than a century. The conflict between those rules, which authorize conscience voting on the first (or any other) ballot, and Section 545(D), which criminalizes it, imposes a second unlawful burden on delegates' associational rights.

The proceedings of the National Convention are governed by RNC Rules 26 through 42, which are (in their current form) "temporary rules" until the adoption of final rules at the Convention. Doc. 17-3 at 22 (Rule 42); *id.* at 3 (preamble describing structure of rules).[1] Roll call votes at the Convention, including balloting for the party's nominations, are governed by Rule 37. Doc. 17-3 at 20–21. A provision of that Rule provides a procedure for a delegate who wishes to vote his conscience to demand a roll-call vote of his delegation:

> (b) In the balloting, the vote of each state shall be announced by the chairman of such state's delegation, or his or her designee; and in case the vote of any state shall be divided, the chairman shall announce the number of votes for each candidate, or for or against any proposition; <u>but if exception is taken by any delegate from that state to the correctness of such announcement by the chairman of that delegation, the chairman of the convention shall direct the roll of members of such delegation to be called, and then shall report back the result to the convention at the conclusion of balloting by the other states. The</u>

---

[1] Those Rules have been readopted in substantially similar form at the start of each Convention, prior to balloting, and there is no indication that this year's Rules package will differ in any relevant respect from the current Temporary Rules. As discussed herein, Rule 37 has been readopted, in substantially the same form, by every Convention since 1880, with the exception of the 1976 Convention.

> result shall then be recorded in accordance with the vote of the several dele-
> gates in such delegation.

Doc. 17-3 at 20 (emphasis added).

Defendants assertion (at 24 n.17) that this provision amounts to nothing more than a "clerical correction rule" is flatly contradicted by the text of Rule, which on its face provides a procedure by which any delegate may force a roll call of the delegation resulting in the recording of "the vote of the several delegates in such delegation." So even if delegates are bound by default under state-party rules, they may (if they so choose) raise an exception pursuant to Rule 37 so as to force the recording of their actual vote preferences.[2]

That is, in fact, the historical basis, the purpose, and the consistent understanding of that provision. The provision was first enacted, in substantially its present form, at the 1880 Convention on the motion of Rules Committee Chairman James A. Garfield. Declaration of Mark W. DeLaquil ("DeLaquil") Ex. A, 1880 RNC Proceedings at 43. Garfield explained that the provision was intended to address an "unseemly controversy" that arose at the 1876 Convention when four Pennsylvania delegates challenged the announcement of their delegation chairman that, pursuant to a state-party rule, all 58 state delegates had cast their presidential-nominee votes for Pennsylvania Governor John Hartranft. *Id.* at 155–56; DeLaquil Ex. B, 1876 RNC Proceedings at 88–100.[3] The challenge resulted in a lengthy debate, DeLaquil Ex. B at 88–100, with the Convention ultimately deciding by vote that "it is the right of every individual member [of the Convention] to vote his individual sentiments" under the then-prevailing rules. *Id.* at 100. At the 1880 Convention, Garfield explained that his new rule was intended to prevent a repeat of the "spectacle…of four delegates rising on

---

[2] Correll's ability to invoke Rule 37, thereby causing the recordation of his vote and the vote of all other Virginia delegates, is an integral part of the bundle of association rights that he possesses as a National Republican Convention delegate. Yet, given his proclaimed intention not to vote for Donald Trump, his exercise of the Rule 37 process would clearly violate Section 545(D).

[3] The chairman of the Pennsylvania delegation to the 1876 Convention explained, "The convention which elected our delegates passed unanimously a resolution instructing us to vote for Hartranft…." DeLaquil Ex. B at 91.

the top of their seats and protesting against the vote of their chairman" by putting beyond debate the principle "that each individual shall have the right to vote." DeLaquil Ex. A at 156.

The Rule was quickly put into use, with individual delegates challenging chairmen's announcement of unanimous votes and demanding that a roll call be conducted. For example, when the Florida chairman announced that the delegation's eight votes would all go Ulysses S. Grant, a single delegate acted to have his vote recorded, instead, for James G. Blaine. DeLaquil Ex. A at 203. Likewise, at the 1884 and 1888 Conventions, the "Garfield Rule" was invoked 19 times by delegates disputing unanimous delegation votes. Curly Haugland & Sean Parnell, Unbound 17 (2016).[4] At the 1912 Convention, the Illinois delegate chair cited the rule as grounds to disregard state-party instructions that the delegation cast its votes for Theodore Roosevelt, explaining that he was aware that "[a] number of the delegates desire to have the vote challenged." DeLaquil Ex. C, 1912 RNC Proceedings at 391–92. The Oregon delegation at that same convention similarly used the Garfield Rule to buck a state statute requiring the delegation to vote for Roosevelt as the primary winner. *Id.* at 400. *See also* DeLaquil Ex. D, 1920 RNC Proceedings at 183–84, 189 (same issue with Oregon delegation). The rule has been invoked dozens of times since then, in a variety of circumstances. Haughland & Parnell at 103–09 (citing invocations identified in official convention proceedings). *See also* DeLaquil Ex. F, 1968 RNC Proceedings at 375–76 (invoking Garfield Rule to poll Virginia delegation); *id.* at 276–77 (invoking Garfield Rule to poll Virgin Islands delegation); DeLaquil Ex. E 1940 at 303 (invoking Garfield Rule to challenge announcement of unanimous ballot by Oklahoma).[5]

---

[4] Available at http://thisiscommonsense.com/pdf/Unbound_online.pdf.

[5] Rule 38, the "Unit Rule," was enacted to more clearly communicate to delegates their rights under the Garfield Rule. Haughland & Parnell at 23 (quoting Transcript of the Rules Committee of the 1964 Republican National Convention at 69) ("The only reason that this sentence has been put in here is because we have had over the past two or three years from many members of this Committee, from interested Republicans, and more recently from people who are delegates, saying we are not lawyers and we don't understand all the impli-

The right of delegates to vote their conscience under the Garfield Rule is sufficiently well established that, when the party sought for the first time in its history to restrict that right for the 1976 Convention, it had to amend the rule. The amendment added this additional language: "provided, however, that in any event, the vote of each State for the nomination for President shall be announced and recorded (or in the absence of an announcement shall be recorded) in accordance with the results of any binding Presidential Primary or direct election of delegates bound or pledged pursuant to state law." DeLaquil Ex. G, 1976 RNC Proceedings at 261. *See also id.* at 416 (explaining that 1976 amendment defeated Garfield Rule right to have vote recorded contrary to state binding requirement). Notably, that additional language, which was viewed as necessary to block conscience voting in 1976, has never been repeated in the rules governing subsequent conventions. Haughland & Parnell at 38. *See also* Doc. 17-3 at 20 (current temporary rule omitting 1976 language).

Defendants' citation (at 20) of Rule 16(a) as enforcing state-party binding rules at the National Convention is inapposite. According to the RNC Rules themselves, Rule 16 is not among those that govern proceedings at the Convention. *See* Doc. 17-3 at 19 (identifying which rules govern the "Proceedings of the National Convention"); *id.* at 22 (identifying "temporary rules" that will initially govern Convention). Also according to those Rules, Rule 16 expires at the commencement of the 2016 Convention. *Id.* at 3 (rules remain in force "until the next national convention," where new rules are adopted). As the Chairman of the RNC Standing Committee on Rules explained when Rule 16(a) was adopted in 2013, that rule does not override or conflict with the Garfield Rule and Unit Rule because those two rules "apply to the casting of votes, and the section we are discussing here is the selection of delegates." DeLaquil Ex. H, 2012 Rules Committee Transcript at 252. Unless a rule

---

cations and if the Republican Party doesn't have the unit rule, in other words a delegate coming to this Convention has the right to stand up and vote his judgement at the time, we'd like to have somebody say so.").

akin to Rule 16(a) is adopted in the rules governing the Convention, an occurrence that has occurred only in 1976, the Garfield Rule, and conscience voting, remain in force.

Section 545(D) plainly conflicts with that right to conscience voting, and Defendants do not contend otherwise, only disputing the existence of that right under the RNC Rules. *See* Opp. at 20; *id*. at 8 (acknowledging that Section 545(D) renders delegates "bound to the prevailing candidate for the first ballot," no matter their preference). That conflict, as with the conflict between Section 545(D) and RNC and RPV allocation rules, burdens delegates' associational rights, by restricting their expressive association with other national-party delegates "in the vital process of choosing Presidential and Vice-Presidential candidates." *Cousins*, 419 U.S. at 489–90. In this way, the Garfield Rule's provision for conscience voting provides a separate and independent ground to enjoin enforcement of Section 545(D).

### C. The Supreme Court Has Held That the Sole Interest Identified by Defendants in Support of Section 545(D) Is Not Compelling

Because, as shown above and in Correll's Motion Memorandum (at 8–9), Section 545(D) "burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest and is narrowly tailored to serve that interest." *Eu*, 489 U.S. at 222 (citations omitted). Defendants' showing falls far short.

As an initial matter, Defendants' attempt to dispute (at 5–7) the legal standard that the Supreme Court has applied in every single case involving state attempts to regulate party members' private associations is meritless. *See Cousins*, 419 U.S. at 489 (considering whether Illinois had a "compelling interest" to justify regulation); *Democratic Party of the United States*, 450 U.S. at 124 ("We must consider, finally, whether the State has compelling interests that justify the imposition of its will upon the appellants."). The cases cited by Defendants are not to the contrary, instead concerning *election regulations* that do not directly "impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates" but only incidentally burden those rights in furthering a state's interest in election admin-

istration. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992) (lesser standard applies when challenged "election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters") (quoting *Anderson*). By contrast, a delegate-binding mandate directly burdens associational rights—that is, after all, the point—is a content-based restriction on speech and association, and is not an election regulation at all. *See Democratic Party of the United States*, 450 U.S. at 125 (holding that state interests in election regulation are irrelevant "to the imposition of voting requirements upon those who, in a separate process, are eventually selected as delegates").

In any instance, even where the Supreme Court has quoted the language from *Anderson* and *Burdick* on which Defendants rely, it has still required a state to demonstrate that a provision directly burdening the rights of party members to freely associate "is a narrowly tailored regulation which advances the State's compelling interests." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986) (describing state's burden where challenged law barred open primaries); *id.* at 213–14 (1986) (quoting *Anderson*). *See also California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) (quoting *Burdick*); *id.* at 582 (Blanket-primary law "is therefore unconstitutional unless it is narrowly tailored to serve a compelling state interest.").

The only interest cited by Defendants (at 28) as justifying Section 545(D)—giving effect to primary votes—is squarely foreclosed by precedent. *See Cousins*, 419 U.S. at 489 (rejecting, in the context of a national convention, Illinois's asserted "interest in protecting the integrity of its electoral processes and the right of its citizens under the State and Federal Constitutions to effective suffrage"); *Democratic Party of the United States*, 450 U.S. at 122 ("Here, the members of the National Party, speaking through their rules, chose to define their associational rights by limiting those who could participate in the processes leading to the selection of delegates to their National Convention."); *California Democratic Party*, 530 U.S. at 583 (rejecting argument that state's interest in ensuring "the right to an effective

11

vote" supported blanket primary for state government elections). Indeed, Defendants cite no authority recognizing their asserted interest as weighty, much less compelling, and they make no attempt to reconcile that interest with the cases rejecting it as a basis for a state to burden private associations.

### D. Defendants Fail To Show That Section 545(D) Is Narrowly Tailored

Defendants simply assert (at 28), without any explanation or argumentation, that Section 545(D) is narrowly tailored to achieve their interest in giving effect to primary votes. Defendants' failure to meaningfully address narrow tailoring forfeits the point. In any case, for the reasons stated in Correll's Motion Memorandum (at 11), which Defendants do not address or dispute, it is not.

### E. Intervenors' Merits Arguments Are Deeply Confused

Intervenors' apparent belief that Correll's claims challenge party rules is incorrect. To the contrary, he seeks to enjoin enforcement of a state law that conflicts with party rules. *See* Amend. Verified Amend. Compl. at 12 (requests for relief concern only "the final sentence of Section 545(D) of Title 24.2 of the Virginia Code"); Proposed Order Granting Motion for Temporary Restraining Order at 5 (same). For that reason, and contrary to Intervenors' assertion (at 3, 12), *Ray v. Blair* does not "destroy[]" Correll's entitlement to relief. That decision holds that "the Twelfth Amendment does not bar a political party from requiring the pledge to support the nominees of the National Convention." 343 U.S. 214, 231 (1952). The reason that neither Correll nor Defendants cited *Blair* is that it is irrelevant, because Correll's claims do not challenge, under the Twelfth Amendment or any other authority, a party's "power to fix political or other qualifications of its own members" or any other party decision. *Id.* at 217.[6] Correll believes that such decisions are protected expressions of party members' First Amendment rights and brought this suit to vindicate that principle. There is

---

[6] The harmony between *Blair* and *Cousins* and *Democratic Party of the United States* is further manifested by the fact that those decisions cite *Blair*.

an inconsistency (to say the least) between Intervenors' stated interest in enforcement of party rules and opposition to Correll's request to enjoin enforcement of a statute that subjects all Virginia RNC delegates—including the Intervenors themselves—to criminal punishment for following those same rules.

Intervenors' argument that a decision reaffirming *Cousins* and *Democratic Party of the United States* would upset states' ability to bind electoral college electors has been twice rejected out of hand by the Supreme Court. *See Democratic Party of the United States*, 450 U.S. at 125 n.31 ("Any connection between the process of selecting electors and the means by which political party members in a State associate to elect delegates to party nominating conventions is so remote and tenuous as to be wholly without constitutional significance. In *Cousins*, despite similar arguments by Illinois, all nine Justices agreed that a State could not constitutionally compel a national political convention to seat delegates against its will.").

Intervenors' other "merits" arguments (at 12–14) actually contest Correll's standing as a delegate, not the merits of his claims, and so are addressed below.

## II.    The Plaintiff Has Standing Because Section 545(D) Places RNC Delegates in Jeopardy for Voting According to Party Rules and Threatens Their Seating at the Convention

Defendants concede that Section 545(D) regulates RNC delegates by requiring them, "for the first ballot at the party's national convention, to vote for the candidate receiving the most votes in the primary election." Opp. at 8. Where the plaintiff is the "object" of a challenged government action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). In this instance, Section 545(D) injures the associational rights of RNC delegates, including Correll, by threatening them with legal jeopardy for voting in accordance with party rules. Enjoining enforcement of Section 545(D) would redress that injury by allowing delegates to associate freely with fellow party members at the Convention. Defendants' and Intervenors' argument that those associational

rights belong solely to the Party, and not its members and delegates, cannot be reconciled with governing case law recognizing that a party's associational rights are, in fact, derivative of those of its members.

### A. Section 545(D) Injures Virginia Delegates' Associational Rights by Impairing Their Ability To Vote as Authorized by Party Rules

Section 545(D)'s "winner-take-all" binding provisions injure Correll and the other putative class members by burdening their right to freely associate at the National Convention. Such state-law binding requirements, the Supreme Court held in *Democratic Party of the United States*, constitute a "substantial intrusion into the associational freedom *of the members of the National Party*." 450 U.S. at 126 (emphasis added).

"[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). In this case, Correll has affirmed that he intends to cast his first-ballot vote at the 2016 RNC Convention for a candidate other than the primary winner, Donald Trump, an act that is proscribed on the face of Section 545(D) and thereby subjects him to a credible threat of prosecution. *Compare id.* at 2343 (discussing *Babbitt*); *Virginia v. Am. Booksellers Ass'n Inc.*, 484 U.S. 383 (1988); *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)).[7] He and other delegates presently suffer that injury-in-fact.

Defendants' principal challenge to Correll's standing is the argument (at 20–24) that his injury is actually caused by the choices of the Republican Party, not Section 545(D). But, as shown above, that is not so. The RNC and RPV acted to provide that Virginia RNC delegates are bound, by default, to cast their first-ballot votes proportionally. RNC rules pro-

---

[7] The Supreme Court has suggested that "ripeness" doctrine imposes no additional requirements, given "the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Driehaus*, 134 S. Ct. at 2347 (quotation marks omitted).

vide that, on each ballot, the delegation "chairman shall announce the number of votes for each candidate" from the delegation. Doc. 17-3 at 20. Correll has affirmed, in his verified complaint, that he will not vote for Donald Trump on any ballot. Amend. Verified Compl. ¶ 21.[8] Correll can carry out that affirmation consistent with RNC and RPV rules by coordinating his vote with those of other members of the delegation, at least some of whom (like the Intervenors) have no objection to voting for Trump. Doing so, however, directly violates Section 545(D)'s mandate that he (and all of the delegates) cast their first-ballot vote for Trump. Indeed, no matter how the first-ballot votes are allocated among the delegate class members, in a proportional allocation 32 of the 49 Virginia delegates will cast votes that violate Section 545(D). Amend. Verified Compl. ¶ 22. In this way, Section 545(D) impairs their right to associate with other party members attending the Convention to select as a presidential nominee the "standard bearer who best represents the party's ideologies and preferences." *California Democratic Party*, 530 U.S. at 575 (quotation marks omitted).

In fact, Section 545(D) also injures Virginia delegates' associational rights by threatening to deny them the ability to participate in the Convention at all. As described above, the RNC sought to prevent frontloading of the primary season by preventing state parties conducting early primaries from employing winner-take-all binding. *See* Doc. 17-3 at 12 (Rule 16(c)(2)). The convening rules for the 2016 Convention provide for enforcement of that prohibition: "If any state or state Republican Party violates Rule No. 16(c)(2), the number of delegates and the number of alternate delegates to the national convention from that state shall each be reduced by fifty percent (50%)." Doc. 17-3 at 15 (Rule 17(a)). That is not an idle threat: shortly prior to the 2012 Convention, the RNC did take action against state delegations selected in violation of RNC rules.[9] In this way, Section 545(D)'s overriding of

---

[8] Correll, as a delegate, is "entitled to one (1) vote" on each ballot. Doc. 17-3 at 19 (Rule 29(a)).

[9] *See, e.g.*, Christopher Cousins, GOP committee rejects Maine delegates; LePage won't attend national convention, Bangor Daily News, Aug. 24, 2012, available at

party rules may prevent Correll and other Virginia delegates from even being able to participate in any balloting for the party's presidential candidate, directly impairing their associational rights.

Section 545(D)'s conflict with Rule 37's conscience protections likewise impairs the associational rights of Virginia delegates, including Correll. As described above, that Rule provides delegates a procedural and substantive right to vote as they see fit, and thereby exercise their associational right to freely participate in "the process by which a political party selects a standard bearer who best represents the party's ideologies and preferences." *California Democratic Party*, 530 U.S. at 575 (2000) (quotation marks omitted). But Section 545(D) criminalizes exercise of that right. Moreover, that Rule's roll-call procedure provides an additional basis to identify those delegates voting for candidates other than the primary winner. Thus, by invoking Rule 37, a delegate increases the jeopardy of prosecution under Section 545(D) of members of the delegation.

## B.    An Injunction Will Redress the Injury Caused by Section 545(D)

Defendants' argument on redressability (at 20) simply mirrors their argument on injury and causation. But because Section 545(D) directly impairs the right of Virginia delegates to associate freely with other party members at the Convention in choosing their party's presidential nominee by threatening them with criminal prosecution for voting in accordance with party rules, enjoining it will redress their injury. With that provision enjoined, Correll and other Virginia delegates will be free to vote as authorized by party rules, and Correll will be free to vote against Donald Trump—the precise action that Section 545(D) prevents him from taking.

## C.    Delegates Have Standing To Vindicate Their Associational Rights

Governing precedent unanimously rejects the argument by Defendants (at 25–26) and Intervenors (at 12–14) that only political parties, as organizations, and not their mem-

---

http://bangordailynews.com/2012/08/24/politics/lepage-not-attending-gop-convention-after-delegate-dispute/.

bers or delegates have an interest in enforcing their rules. That distinction is a false one: "Delegates for practical purposes constitute the National Party—they make its rules, adopt its platform, provide for its governance, as well as nominate candidates." *Bachur v. Democratic Nat'l Party*, 836 F.2d 837, 841–42 (4th Cir. 1987).

Associational rights belong to party members and delegates because they are, after all, the ones associating. Notably, in *Cousins* it was delegates, not any political party, who sought to vindicate their associational right to join together to select a presidential nominee free from state regulation. 419 U.S. at 478–79. As the Court made clear, "any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Id.* at 487–88 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)) (alteration omitted). Likewise, *Democratic Party of the United States* held that Wisconsin's delegate-binding law was a "substantial intrusion into the associational freedom of members of the National Party." 450 U.S. at 126 (footnote omitted). *See also Republican Party of Connecticut*, 479 U.S. at 217 (holding that closed-primary mandate was an "impingement upon the associational rights of the Party and its members"); *California Democratic Party*, 530 U.S. at 576 ("The members of a recognized political party unquestionably have a constitutional right to select their nominees for public office.") (quotation marks omitted); *Eu*, 489 U.S. 214, 224–52 (holding that, with respect to ban on endorsements by political parties, "imposing limitations on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association") (quotation marks omitted); *id.* at 225 n.15 (rejecting argument that parties consented to regulation because it "ignores the independent First Amendment rights of the parties' members," some of whom were also plaintiffs in that suit).[10]

---

[10] This holding of *Eu* also provides grounds, in addition to the conflict between Section 545(D) and party rules, to reject Defendants' argument (at 25) that the RPV or RNC consented to Section 545(D).

In contrast to this long line of Supreme Court precedent, neither Defendants nor Intervenors cite a single authority to the contrary.

### D. Delegates Face a Credible Threat of Prosecution

"A non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat [of prosecution], and a case or controversy thus exists in the absence of compelling evidence to the contrary. This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights." *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (quotation marks, alteration, and citations omitted). As described above, Correll and other delegates face a credible threat of prosecution because Section 545(D), on its face, restricts their rights to engage in expressive association with other members of the Republican Party by voting in accordance with party rules.

Defendants seek (at 16) to cast doubt on the threat of prosecution faced by Correll and other delegates, but they do not actually affirm or argue that they cannot or will not enforce that provision against him and other RNC delegates. Indeed, *the Attorney General makes no representation at all before this Court regarding enforcement by the Virginia Department of Justice*, despite that he has "full authority to do whatever is necessary or appropriate to enforce the election laws or prosecute violations thereof." Va. Code § 24.2-104(A). Likewise, the Virginia State Board of Elections has statutory authority to require the Attorney General to initiate an investigation of alleged violations of Section 545(D). Va. Code § 24.2-104(C).

Commonwealth Attorney Marc Abrams, who is also empowered to enforce the provision, states only that he does "not intend to prosecute Mr. Correll or any other Republican delegate." Doc. 25-1 at 3. That statement does not even rise to the level of a "promise[] not to prosecute," and such promises, in any instance, "regularly are deemed inadequate and do not sway the courts." *Lytle v. Brewer*, 73 F. Supp. 2d 615, 621 (E.D. Va. 1999) (citing cases) (quotation marks omitted). That is because a "live controversy" continues to exist when "all

that remain[s] between the plaintiff and impending harm was the defendant's discretionary decision—which could be changed—to withhold enforcement." *ACLU v. Florida Bar*, 999 F.2d 1486, 1494–95 (11th Cir. 1993) (quoting *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 762 (11th Cir. 1991) (alterations omitted)). In this instance, Defendants refuse to even make a decision to withhold enforcement, with only one of them affirming only that withholding enforcement is his present intention.

Defendants also suggest (at 16–19), without actually committing themselves, that Section 545(D) cannot be enforced except in the rare instance that a national party convention is held within the Commonwealth.[11] But "[i]t would be unreasonable to assume the General Assembly adopted [the statute] without intending that it be enforced." *Am. Booksellers Ass'n, Inc. v. Virginia*, 802 F.2d 691, 694 n. 4 (4th Cir.1986), *aff'd in relevant part*, 484 U.S. 383 (1988). *See also Mobil Oil Corp. v. Attorney General*, 940 F.2d 73, 76 (4th Cir. 1991) ("We see no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced.").

It should not be surprising, then, that Virginia law generally permits the enforcement of offenses like Section 545(D) even when aspects of the prohibited conduct occur out of state. As the Virginia Supreme Court explained, the "state may exercise jurisdiction over criminal acts that are committed outside the state, but are intended to, and do in fact, produce harm within the state." *Jaynes v. Com.*, 276 Va. 443, 452, 666 S.E.2d 303, 307 (2008). *See also Travelers Health Ass'n v. Com.*, 188 Va. 877, 892, 51 S.E.2d 263, 269 (1949) ("It has long been a commonplace of criminal liability that a person may be charged in the place where the evil results, though he is beyond the jurisdiction when he starts the train of events of which the evil is the fruit.") (quotation marks omitted). Given Defendants' contention (at 4, 28) that an injunction of its winner-take-all mandate would produce harm within the state

---

[11] The most they are willing to say is that "there would be serious difficulties" in bringing a prosecution under Section 545(D), not that they cannot bring such a prosecution. Opp. at 19.

"by rendering the primary results meaningless," it cannot seriously be disputed that those same Defendants might criminally enforce Section 545(D) under the theory that "the train of events" that will lead to Correll's and other delegates' violation of Section 545(D) started in the state, when they signed statements of qualifications binding them, by default, in conflict with Section 545(D). *See* Doc. 17-2 at 15.

Moreover, Defendants could choose to prosecute Republican delegates under the theory that a "crime also could be prosecuted in the [Virginia] jurisdiction in which the perpetrator formed the intent." *Kelso v. Com.*, 282 Va. 134, 138, 710 S.E.2d 470, 472 (2011). *See also Rhodes v. Com.*, 145 Va. 893, 895, 134 S.E. 723, 724 (1926) ("The formation in one county of the fraudulent intent to appropriate the property to one's own use, followed by a conversion of the property, with that intent, in another county, is sufficient to give jurisdiction in the county wherein such intent was formed.").

In sum, it would be "an anomalous result" if Defendants were permitted to (1) maintain that Section 545(D) is constitutional, enforceable, and necessary to promote the public interest and yet, if a party like Correll seeks pre-enforcement review, to (2) come in to this Court and deny that it can be enforced with respect to nearly any national party convention. *Compare ACLU*, 999 F.2d at 1495. Virginia law does not support that result.

## III. Defendants Do Not Seriously Dispute the Plaintiff's Showings on Irreparable Injury, the Balance of the Equities, and the Public Interest

Although nominally disputing Plaintiff's showings on irreparable injury, the balance of the equities, and the public interest in their "Summary of Argument" (at 4), Defendants do not actually present any argumentation on those points. Their summary argument regarding irreparable injury mirrors their argument on standing, and is mistaken for the same reason. They do not address or dispute governing case law holding that a plaintiff's showing that he is likely to prevail on the merits of a First Amendment claim satisfies the other injunction factors. *See* PI Mot. Mem. at 12–14 (discussing applicable precedent). They do assert, with respect to the balance of equities and public interest, that an injunction would im-

pose "great cost" on the Commonwealth of Virginia because it would "render[] the primary results meaningless." But the Defendants chose to hold the Republican primary after the RPV's October 2015 declaration that delegates would be proportionally allocated, making that claim lack credibility. Moreover, the law is clear that "it is always in the public interest to protect First Amendment liberties." *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011) (quoting *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)). Defendants cite no authority that the public has any cognizable interest in violating the First Amendment-protected associational rights of RNC delegates.

The Intervenors contend (at 14) that the public interest weighs "against last-minute changes to election laws," but Section 545(D) does not regulate elections at all and so does not implicate state and public interests in the orderly administration of elections that might weigh against "last-minute changes." *See Democratic Party of the United States*, 450 U.S. at 125.

## IV. The Plaintiff's Challenge Is Not Barred by Laches

The Defendants' and Intervenors' laches defense is meritless. The putative class seeks only prospective, prohibitive injunctive relief, making application of laches inapplicable to their claims. Even if laches potentially were applicable, Defendants' laches argument smacks of "heads I win, tails you lose" logic. Under their view, the class's claim is *still* not ripe, discrediting any claim that Correll unreasonably delayed in bringing this suit or that the Commonwealth is prejudiced. In fact, Correll acted diligently at all times, soliciting the Commonwealth's position on the enforceability Section 545(d) shortly after he was selected as a delegate to the 2016 Republican National Convention and bringing suit shortly after it became reasonably certain that the Commonwealth did view Section 545(d) as enforceable.

### A. Laches Does Not Apply To Prospective Injunctive Relief Claims

Laches does not apply "if the claim is one for injunctive relief" because "[a] prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm" and thus "[i]nherently…cannot be so remote in time as to justify the application of

the doctrine of laches." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001). *See also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 906 (9th Cir. 2003), *vacated on other grounds*, 344 F.3d 914 (9th Cir. 2003) (en banc) (holding, in voting rights case, that "[w]hen prospective injunctive relief is sought based on new actions of a defendant, laches ordinarily does not apply"); *Envtl. Def. Fund v. March*, 651 F.2d 983, 1005 n.32 (5th Cir. 1981) ("[W]e have granted only prospective relief as a remedy…, and laches may not be used as a shield for future, independent violations of the law. The concept of undue prejudice, an essential element in a defense of laches, is normally inapplicable when the relief is prospective."). The injunction sought in this case would prohibit Defendants from enforcing Section 545(d) only in the future, *after* Correll casts his vote at the Republican Convention in late July and therefore does not involve "remote" harm. While laches may prevent an injunction requiring *affirmative* state action in the course of conducting an election, such as printing new ballots, *see Perry v. Judd*, 471 Fed. App'x 219, 225–28 (4th Cir. 2012), that scenario is altogether different from an injunction requiring nothing but *inaction* in response to a future event.

### B. Laches Does Not Apply Because Correll Acted Diligently and Defendants Have Not Been Prejudiced

Laches does not bar Correll's claims. "Laches imposes on the defendant the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)). The Court is tasked with "balancing" these two elements, and thus laches "depends upon the particular circumstances of the case." *Id.* And because of the class of Plaintiffs' First Amendment injuries, the presumption is against application of laches. Although laches "'can, in some circumstances, serve as a defense to First Amendment claims,'" First Amendment rights are afforded special consideration and will, for instance, outweigh "'increased monetary expenditures'" and, by consequence, prevail where, as here, "Defendants will not be required to increase mone-

tary expenditures." *Ctr. for Individual Freedom, Inc. v. Ireland*, 613 F. Supp. 2d 777, 807 (S.D.W. Va. 2009) (quoting *Nader 2000 Primary Comm., Inc. v. Hechler*, 112 F. Supp. 2d 575, 579 n.2 (S.D.W. Va. 2000) (Haden, C.J.)). Not only did Correll act diligently in pursuing his claim, which only became ripe as a practical matter shortly before he filed, but the Commonwealth identified no pecuniary harm specific to application of Section 545(D) to Republican delegates and has no little or no legitimate interest in regulating the affairs of delegates at a national-party convention. This balance weighs overwhelmingly against applying laches.

**There was no unreasonable delay.** Laches depends on a showing that the plaintiff "'delayed inexcusably or unreasonably in filing suit,'" as judged from the time he "was able to bring" the case. *Perry*, 471 Fed. App'x at 224 (quoting *White v. Daniel*, 909 F.2d 99, 2013 (4th Cir. 1990). That occurs when the case is "ripe." *Id.*

This case was ripe on May 25, 2016, when Correll had "every incentive" to bring his claim. *See id.* (applying laches where plaintiff, not only had a ripe cause of action, but "every incentive" to bring it long before the case was filed). There was no point in challenging the first-ballot binding requirement as long as there remained the extant possibility that the first ballot would be irrelevant to the outcome of the nominating process. May 25 was the date Trump obtained sufficient presumptive delegates to lock a presumptive first-ballot victory. Had Correll brought his case earlier—when Trump was engaged in a heated primary contest that appeared to be headed to a "contested convention" at which no party would win on the first ballot—Correll would not have had an injury worth litigating because Section 545(D)'s binding requirement applies only "on the first ballot," and any vote that Correll cast for Trump on that ballot would have been inconclusive. Accordingly, Correll not have any "incentive to challenge the requirement at that time." *Id.*

On that very date, May 25, 2016, Correll attempted to identify whether there was a "credible threat of enforcement" by contacting the Virginia State Board of Elections, and that office directed him to Defendant Abrams, who did not indicate his intent to enforce the

statute until June 8. Defendants fault Correll for this, claiming (at 11) that "Virginia law does not empower the Department of Elections to render advisory opinions," but they tellingly cite no provision of Virginia law for the remarkable proposition that state officials cannot inform citizens of their rights under law. *Contrast Marcellus v. Va. State. Bd. of Elections*, 2015 WL 5285819, at *7 & n.19 (E.D. Va. Sept. 9, 2015) (charging plaintiff of knowledge of what "the law stated," not with what inferences should be taken from what "Virginia law does not empower"). Nor is Defendants' litigation position consistent with their actual practice, as the Department of Elections website contains voluminous guidance documents that are not rules or regulations.[12] Moreover, it was the Department of Elections itself that directed Correll to contact Abrams and Abrams in fact *did* respond with his view of the statute's effect, which made concrete the risk of enforcement to Correll.

Even if Correll's actions were unnecessary, they resulted in a delay only between May 25 and June 24, when Correll brought this action, and much of that time period was independently necessary for Correll to weigh the pros and cons of litigation, identify and hire counsel, and prepare the case filing. The delay is roughly one third of the time Defendants claim is unreasonable. *See* Opp. at 11 (citing *Marcellus*, 2015 WL 5285819, which involved an 88-day delay).

Defendants' assertion to the contrary, that Correll "should have challenged" Section 545(D) "prior to the primary," Opp. at 11, or perhaps years ago, Opp. at 9–10, is equal parts wrong and opportunistic.[13] It is wrong because Section 545(D) applies to "delegates and alternates," not those running or considering running to be delegates, precluding Correll from having standing to challenge Section 545(D) until he was selected as a Delegate. Correll did

---

[12]     Virginia     Department     of     Elections,     Guidance     Documents, http://townhall.virginia.gov/L/GDocs.cfm?AgencyNumber=132.

[13] Defendants' contention (at 9) that the decision of Republican officials not to bring a case years ago counts against Correll is mistaken: the only delay that counts is "the lack of diligence by the party against whom the defense is asserted." *White*, 909 F.2d at 102 (quotation marks omitted).

not become a delegate until April 16, 2016, well after the March 1, primary. The Defendants' claim is likewise opportunistic because these same Defendants are claiming *even today* (at 16–19) that the case is not ripe and so can hardly be heard to complain that Correll should have brought the case months or even *years* ago. *See* Opp. at 9–11.

**Defendants Were Not Prejudiced.** To establish prejudice, the "defendant must prove that he has suffered a disadvantage or some other harm caused by reliance on the plaintiff's conduct." *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va. 2012), *aff'd* 472 Fed. App'x 219 (2012). Defendants fail this showing for three reasons.

First, an injunction would not require Defendants to do *anything*. It would merely prevent them from prosecuting or otherwise enforcing Section 545(D) in the future against Correll and the other delegates for their first ballot votes at the Convention. In contrast, each of Defendants' authorities involve requested mandatory injunctions that would force elections officials to take such affirmative actions like altering ballots at the last moment, requiring re-designing, re-printing, and re-mailing ballots on the eve of voting, "throw[ing]" elections planning "into far greater confusion than would have been the case with a timely legal action," *Perry*, 471 Fed. App'x at 226–28, and creating the "risk that all affected localities" overseeing elections "will be unable to have modified ballots available by" deadlines imposed by state and federal law. *Marcellus*, 2015 WL 5285819, at *8–10 & n.21 (quotation marks omitted). *See also Miller v. Brown*, 462 F.3d 312, 320 (4th Cir. 2006) (discussing ramifications of belated challenge to such elections procedures as open primaries and reapportionment plans, which cause "major disruption") (quotation marks omitted).

Second, the injunction would not require Defendants to forebear from anything they have a legitimate interest in doing. Virginia has "no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates." *Cousins*, 419 U.S. at 490. Nor do the residents of Virginia have any legitimate interest in criminally penalizing delegates to a national party convention for casting a ballot for a person other than the candidate who received a plurality of votes in the Virginia primary. These interests again

stand in stark contrast to Defendants' cases, which applied laches to prevent intrusion into "state interest[s] the Supreme Court has repeatedly credited." *Perry*, 471 Fed. App'x at 227.

Third, Defendants' claim (at 12) that Virginia will suffer "significant financial and administrative prejudice" due to its conduct of the primary is mistaken in at least two respects. First, it is an instance of the sunk-cost fallacy, given that the primary has already been conducted, that no action by this Court can alter that, and that any benefits or burdens can only be weighed prospectively. *Cf. In re Kmart Corp.*, 359 F.3d 866, 873 (7th Cir. 2004). Second, Defendants do not even attempt to make a factual showing those costs were "caused by reliance on the plaintiff's conduct." *Perry v. Judd*, 840 F. Supp. 2d at 954. Defendants do not even try to represent what they would have done differently had Correll brought a suit earlier, and the undisputed facts indicate that they would have done *nothing* differently. Defendants were on notice as of September 2015 that RPV rules contradict state law and allocate delegates proportionally rather than winner-take-all. *See* Doc. 17-2 at 7. Nonetheless, Defendants conducted the primary knowing that RPV intended not to allocate delegates in accordance with Section 545(D)'s "winner-take-all" methodology, and so can hardly claim now to have spent their resources in vain.[14] Accordingly, Defendants properly failed to elicit testimonial evidence that they would have "cancelled the Republican primary" if Section 545(D) was unenforceable and properly did not claim that holding the 2016 Republican presidential primary imposed any costs for the Commonwealth beyond those

---

[14] Defendants' suggestion (at 12) that the "abbreviated litigation schedule" is sufficient prejudice to support laches is tenuous at best. Their only cited authority, *Miller*, 462 F.3d at 320, states that expedited litigation on "a novel constitutional question" is "troublesome"—not that an abbreviated litigation schedule amounts to prejudice *per se*. Moreover, this case does not present "a novel constitutional question"; the law is crystal clear that a conflict between state delegate-binding law and delegates' First-Amendment-right to party rules must be decided against state law. The only thing making this case difficult is Defendant Abrams's and the other Defendants' initial suggestion that the law would be enforced and subsequent suggestion that it cannot and will not be enforced—yet without taking the additional step of placing that in a settlement, which would end this entire matter.

that otherwise would have been incurred by holding concurrent elections (like the Democratic Party primary).

Even without binding force, the 2016 Republican Primary would not be "a waste." Opp. at 13. Under RPV rules providing for proportional allocation the primary vote would be given *greater* effect than under Section 545(D) because a proportional allocation would breathe meaning into the 65 percent of votes that did not go to Trump, whereas Virginia law would effectively nullify that super-majority. And, in any instance, the results of a preference primary are not something that a delegate lightly disregards.

## V.     Section 545(D) Is Facially Invalid

Defendants not only fail to show that Section 545(D) can be lawfully enforced in any circumstance, but they also state the wrong standard for facial challenges. *See* Opp. at 26. "In the First Amendment context…, a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, n.6 (2008)). This standard is less demanding than the one—"that no set of circumstances exists under which [the statute] would be valid"—that is required for facial invalidation in other contexts. *Id.* at 472 (quotation marks omitted).

The final sentence of Section 545(D) fails under either standard because there is no circumstance in which it could be lawfully enforced. The prohibition of Section 545(D) could be enforced only when party rules permit a national convention delegate to cast a first-ballot for a candidate other than the state primary winner, in contravention of Section 545(D). But that is precisely when enforcement is barred by the First Amendment. *See supra* § I; PI Mot. Mem. at § I. By contrast, when a national convention delegate casts a first-ballot vote for the state primary winner, that vote does not fall within the prohibition of Section 545(D), and so there is nothing to enforce. Accordingly, there is no set of circumstances in which Section 545(D) could be lawfully enforced—when it is violated, the violation oc-

curs *because it conflicts with party rules*, in violation of the First Amendment. At the very least, Section 545(D) is overbroad because any conceivable application of it would be unconstitutional. For those reasons, it is facially invalid.

### Conclusion

The Plaintiff respectfully requests that the Court preliminarily and permanently enjoin enforcement of the final sentence of Section 545(D) of Title 24.2 of the Virginia Code.


Dated: July 5, 2016

Respectfully submitted,


 /s/ Mark W. DeLaquil
DAVID B. RIVKIN, JR. (admitted pro hac vice)
ANDREW M. GROSSMAN (admitted pro hac vice)
MARK W. DELAQUIL (VA. BAR # 68088)
RICHARD B. RAILE (VA. BAR # 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
Phone: (202) 861-1527
Facsimile: (202) 861-1783
mdelaquil@bakerlaw.com

*Attorneys for Plaintiff and the Proposed Class*

## Certificate of Service

I hereby certify that on July 5, 2016, I am causing a copy of the foregoing to be filed by the Court's CM/ECF system, which will result in service on counsel of record for all Defendants via electronic mail.

/s/ Mark W. DeLaquil

MARK W. DELAQUIL (VA. BAR # 68088)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
Phone: (202) 861-1527
Facsimile: (202) 861-1783
mdelaquil@bakerlaw.com