

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

Carroll Boston Correll, Jr.,
On behalf of himself and
others similarly situated,

    Plaintiffs,

v.                  Civil Action No. 3:16CV467

Mark R. Herring,
In his official capacity as
Attorney General of the
Commonwealth of Virginia, et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court following a bench trial on the merits of the FIRST AMENDED VERIFIED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF (the "Amended Complaint") (ECF No. 20) filed by Carroll Boston Correll, Jr. ("Correll"). For the reasons, and to the extent, set forth below, judgment including declaratory and injunctive relief will be entered for Correll.

## PROCEDURAL BACKGROUND

Correll, a Virginia delegate to the Republican National Convention, filed a VERIFIED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF ("Complaint") (ECF No. 1) on June 24, 2016. The original Complaint posited a class consisting of Republican and Democrat delegates to the parties' respective

1

national conventions. (Compl. ¶¶ 36-41). Subsequently, Correll filed the Amended Complaint, which does not include Democrat delgates in the putative class. The Amended Complaint now includes allegations purporting to represent a class of all Virginian delegates to the 2016 Republican National Convention. (Am. Compl. ¶¶ 36-41).

Several other Virginian delegates to the 2016 Republican National Convention subsequently moved to intervene as defendants. (ECF No. 22). Over Correll's objection, though upon agreement of the original defendants[1] ("Defendants"), the motion was granted and the additional delegates ("the Intervenors")[2] were permitted to intervene. (ECF No. 29).

There has been no motion for class certification and, given the position of the Intervenors, it is doubtful that even the modified class identified in the Amended Complaint could be so certified. Accordingly, the claims that were tried, and upon

---

[1] Mark R. Herring, Attorney General of the Commonwealth of Virginia; Marc Abrams, Commonwealth Attorney for the City of Winchester; James B. Alcorn, Chairman of the Virginia State Board of Elections; Clara Belle Wheeler, Vice Chairman of the Virginia State Board of Elections; Singleton McAllister, Secretary of the Virginia State Board of Elections; and Edgardo Cortez, Commissioner of the Virginia Department of Elections. (Compl., ECF No. 1). All of these defendants were named in their official capacities and are represented in this case by the Office of the Attorney General.

[2] The Intervenors are John Fredericks, Waverly Woods, Michael Belefski, Eugene Delgaudio, Virgil Goode, Tamara Neo, Howard Lind, and Brandon Howard.

which judgment will be entered, are solely those claims made by Correll, individually.

The Amended Complaint presents five counts. Count I alleges that **Va. Code** § 24.2-545(D) ("Section 545(D)") violates Correll's First Amendment right to free political speech, more specifically his individual right to "vote for a presidential nominee at a party's nominating convention," "by stripping delegates" to the 2016 Republican National Convention "of their freedom to vote their conscience, or to vote consistent with party rules." (Am. Compl. ¶¶ 43-45). Count II alleges that Section 545(D) violates Correll's First Amendment rights of free association, again "by stripping delegates" to the 2016 Republican National Convention "of their freedom to vote their conscience, or to vote consistent with party rules." (Am. Compl. ¶¶ 51-52). Count III alleges that Section 545(D) "exceeds the powers retained by the Commonwealth of Virginia under the Constitution of the United States" and cannot be enforced. (Am. Compl. ¶¶ 59-60). Count IV and Count V present prayers for forms of relief, rather than claims upon which relief may be granted.

Immediately after filing his Complaint, Correll filed a Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 4). During a telephone conference, the parties shortly thereafter agreed to consolidate for hearing and decision the request for a restraining order and the request for

a preliminary injunction. (Tr. Jun. 27, 2016, ECF No. --). The Court set the motion for an evidentiary hearing and oral argument on July 7, 2016. (Order, ECF Nos. 11, 18). At the beginning of that hearing, the parties agreed that, pursuant to Fed. R. Civ. P. 65(a)(2), the Court should further consolidate the hearing on the preliminary injunction with a bench trial on the merits. (Tr. Jul. 7, 2016, ECF No. 42, 164:12-165:5).

At trial, the parties presented a Joint Stipulation (ECF No. 40) and ten Joint Exhibits. Correll presented an additional set of exhibits consisting of minutes from earlier Republican National Conventions. Correll and the Intervenors each presented an expert witness to testify about the Rules of the Republican Party that govern the proceedings of the national party ("RNC Rules"), particularly about RNC Rules 16, 17, 37, and 38. The experts also testified about certain filings that the Republican Party of Virginia ("RPV") made pursuant to RNC Rule 16. At the end of the hearing, counsel presented argument and the case was submitted for decision on the merits.

## FINDINGS OF FACT

At trial, Correll and the Intervenors each presented expert testimony to support their contentions on the meaning, present force, and effect of RNC Rule 16 and of RNC Rules 37 and 38. Correll offered the expert testimony of Erling "Curly" Haughland ("Haughland"), who presently serves as a member of the

4

Republican National Committee, will serve as a delegate to the 2016 Republican National Convention, and has served as a delegate to past Republican National Conventions. (Tr. Jul. 7, 2016 13:4-30:5). Haughland has studied the history of the RNC Rules as far back as 1880, and has co-authored an online book positing the thesis that the RNC Rules allow delegates to vote their consciences at any Republican National Convention.[3] (Tr. Jul. 7, 2016 13:4-30:5). The Intervenors offered the testimony of Jesse Binnall ("Binnall"), a certified professional parliamentarian who has worked with the Republican rules since 2012, has advised Republican convention delegates at the national and local levels about those rules, and has advised Republican presidential candidates about those rules. (Tr. Jul. 7, 2016 103:1-110:11).

Haughland was of the opinion that, even though RNC Rules 37 and 38 do not explicitly provide for "conscience voting," their predecessor rules have been interpreted to allow delegates to vote as they please. (Tr. Jul. 7, 2016 32:13-33:16, 44:10-53:7). Haughland also opined that RNC Rule 16 does not control voting. (E.g., Tr. Jul. 7, 2016 59:24-63:21). Binnall took the view that RNC Rules 37 and 38 do not permit "conscience voting" and that RNC Rules 16(a)(1) and (2) together with RNC Rule 16(c)(2)

---

[3] **Curly Haughland & Sean Parnell, Unbound: The Conscience of a Republican Delegate** (2016), available at http://thisiscommonsense.com/pdf/Unbound_online.pdf.

govern the allocation and binding of delegates when voting. (Tr. Jul. 7, 2016 127:3-130:17, 134:12-22; 136:21-137:19). The experts largely concurred that RNC Rules 13-25 are presently in effect, and that RNC Rules 25-41 are not presently in effect. (Tr. Jul. 7, 2016 36:2-39:7, 135:8-136:2).

There is no need to further discuss the debate over the meaning and effect of RNC Rules 37 and 38 because, as explained below, the "conscience voting" theory is not ripe for decision.[4]

As to Rule 16, the Court credits Binnall's testimony because it is logical and supported by the text of the rules. Thus, the Court finds that RNC Rule 16 is in effect presently and that it controls the allocation and binding of delegates as to their voting at the convention. Additionally, Haughland's views were significantly undermined by the Defendants' impeachment using passages from Haughland & Parnell's publication (e.g., Tr. Jul. 7, 2016 82:10-93:3), and by the fact that Haughland's views on RNC Rule 16 lack any textual support.

In closing arguments, Correll's counsel agreed that, if Correll could vote proportionally to Virginia's primary votes as required by RNC Rule 16, rather than voting for the candidate who garnered the most votes as required by Section 545(D), this would be tantamount to Correll voting his conscience. (Tr. Jul. 7, 2016 225:5-6). Counsel for the Intervenors also agreed that

---

[4] See infra Part I.B.2.

the case could be resolved by enjoining the enforcement of Section 545(D) to allow Virginia's delegates to vote in proportion to the results of Virginia's primary vote as required by RNC Rule 16. However, counsel for the Intervenors stressed that the Intervenors still strongly opposed any finding that RNC Rules 37 and 38, singly or jointly, permit unrestricted conscience voting. (Tr. Jul. 7, 2016 215:15-19, 216:22-220:5).

At the end of the 2012 Republican National Convention, the party issued a set of rules, some of which were to be effective immediately and some of which were proposed for possible adoption at the next convention in 2016. Specifically, on August 27, 2012, the 2012 Republican National Convention adopted the "Rules of the Republican Party" ("RNC Rules"). Those rules were amended four times; the current form of the rules is in the record at Joint Exhibit 1. On this much, the parties agree. However, the parties have radically different views about the meaning and present force of the RNC Rules.

Based on the text of the RNC rules and on Binnall's testimony, the Court finds that RNC Rules 13 to 25 are presently in force regarding convening of the 2016 Republican National Convention, including delegate allocation and the binding of delegate votes. (Tr. Jul. 7, 2016 135:8-136:2).[5] Further, the

---

[5] Correll's own expert did not disagree on this point. (Tr. Jul. 7, 2016 36:2-39:7.)

record shows that RNC Rules 26 to 42, according to Rule 42 itself, are temporary rules for use in the 2016 Republican National Convention[6] and have no force unless they are adopted by the assembled delegates at that convention, which will take place from July 18-21, 2016. (RNC Rules 22; Tr. Jul. 7, 2016 36:2-39:7, 135:8-136:2).[7]

RNC Rule 16(c)(2) requires that any state presidential primary that occurs before March 15, 2016 must "provide for the allocation of delegates on a proportional basis." (Joint Ex. 1, p. 12). According to RNC Rule 17(a), a "state or state Republican Party" that violates Rule 16(c)(2) will have its delegation reduced by 50%. (Joint Ex. 1, p. 15).

RNC Rule 16(f)(1) provides that Republican state committees must adopt rules to govern their primaries by October 1, 2015. (Joint Ex. 1, p. 15). On September 19, 2015, the Republican Party of Virginia ("RPV") adopted a resolution to hold a primary: (1) on March 1, 2016; (2) in which voters would vote directly for presidential candidate, not for delegates; and (3) which, as required by RNC Rule 16(c)(2), would allocate delegates proportionally according to the primary votes received

---

[6] The 2012 RNC Rules did govern the 2012 Republican National Convention at which they were adopted.

[7] As Correll's own expert ceded, Rules 26 to 41 are merely "proposed rules." (Tr. Jul. 7, 2016 39:5-7).

by each candidate, with all the delegates "in one pot." (Joint Ex. 2; Joint Ex. 3, pp. 4, 8). Pursuant to RNC Rule 16(f), RPV timely transmitted this information to the Republican National Committee ("RNC"). (Joint Ex. 3). RPV's Rule 16(f) Filing also included a sample "Declaration and Statement of Qualifications" ("Declaration") that delegates would be required to sign. (Joint Ex. 3, p. 14). That Declaration included a provision implementing RNC Rule 16(c), stating that:

> I further acknowledge, understand, and agree that if elected and if given the ability to vote at the Republican National Convention, my vote on the first ballot will be bound by the results of the March 1, 2016 Virginia Presidential Primary, in accordance with the Allocation Resolution adopted by the RPV State Central Committee on September 19, 2015.

(Joint Ex. 3, p. 14; Joint Ex. 5) (referencing the September 19, 2015 resolution providing for proportional division of delegates). RPV's Rule 16(f) Filing also contained an excerpt from Virginia's elections code, including the text of Section 545(D).

The primary election in which Virginia voters expressed their candidate preferences was held on March 1, 2016. The Virginia Department of Elections certified that candidate Donald Trump won the most votes in the primary election, with a plurality of 34.80 percent of votes. (E.g., ECF No. 25, Ex. 2, 4). Marco Rubio received 31.98 percent, Ted Cruz 16.69 percent,

John Kasich 9.54 percent, and Ben Carson 5.87 percent; all other candidates received less than one percent of the vote. (E.g., ECF No. 25, Ex. 2, 4-5).

At a local convention held on April 16, 2016, Correll was selected as a delegate to the Republican National Convention. (Joint Stip., ECF No. 40, ¶ 17; Joint Ex. 6). Correll signed a copy of the "Declaration and Statement of Qualifications" that had been included in the RPV's Rule 16(f) Filing. (Def.'s Mem. in Opp. to Mtn. for Temporary Restraining Order and Preliminary Injunction, ECF No. 25, 23 n.14) ("Def.'s Resp."). In doing so, Correll agreed to the requirements of RNC Rule 16(c)(2).

Correll pleads under oath that he "believes that Donald Trump is unfit to serve as President of the United States and that voting for Donald Trump" on the first ballot at the 2016 Republican National Convention, as required by Section 545(D), "would therefore violate Correll's conscience." (Am. Compl. ¶ 21). Accordingly, Correll swears that he "will not vote for Donald Trump on the first ballot, or any other ballot, at the national convention." (Am. Compl. ¶ 21).

"Concerned that he could face criminal penalties if he cast his first-ballot convention vote for a candidate other than Donald Trump," Correll on May 25, 2016 contacted the Virginia Department of Elections "to request an advisory opinion regarding the application of Section 545(D)." (Am. Compl. ¶ 25;

Joint Stip. ¶ 21, Joint Ex. 7). The Department of Elections referred Correll, a resident of the City of Winchester, to Marc Abrams ("Abrams"), the Commonwealth's Attorney for the City of Winchester. (Am. Compl. ¶ 25; Joint Stip. ¶ 21; Joint Ex. 7). On June 2, 2016, Correll contacted Abrams, requesting an advisory opinion regarding application of Section 545(D). (Joint Ex. 8). On June 8, 2016, Abrams responded in relevant part that

> My office generally does not respond to requests for legal opinions about potentially criminal conduct which we may or may not prosecute .... However, as you are aware the first rule of statutory construction dictates that we are to interpret words of a statute using the ordinary meaning of the language in the statute. The plain meaning of the statute you cite, Va. Code[] § 24.2-545(D) would appear to be clear.
>
> I refer you to consult private counsel for an opinion as to issues such as jurisdiction, venue, potential penalties, etc.

(Joint Ex. 8).[8] On June 8, 2016, Correll contacted the Chairman of the Electoral Board for the City of Winchester to request an advisory opinion on the application of Section 545(D); the Chairman instructed Correll to contact the Department of Elections. (Joint Stip. ¶ 24). On the same day, Correll again contacted the Department of Elections to request an advisory

---

[8] To provide context to this "as you are aware," Correll is an attorney and ran against Abrams for the City of Winchester Commonwealth's Attorney position in November 2015. (ECF No. 25, Ex. 1, 1).

opinion on the application of Section 545(D); the Department did not respond prior to initiation of this litigation. (Joint Stip. ¶¶ 25-26). After Correll brought suit, Abrams and Cynthia E. Hudson, Chief Deputy Attorney General of Virginia ("Hudson"), expressed that they would not prosecute Correll for not voting for Donald Trump at the 2016 Republican National Convention. (ECF No. 38) ("I believe that there would be serious difficulties in prosecuting a delegate ... I do not anticipate circumstances that would compel ... the Office of the Attorney General to prosecute Mr. Correll or any other Republican delegate for ... conduct in their capacity as a delegate"); ECF No. 25, Ex. 1, 3) ("I do not intend to prosecute Mr. Correll or any other Republican delegate for their conduct at the 2016 Republican National Convention in Ohio").

These facts form the basis for the claims asserted in Counts I and II of the Amended Complaint, and provide the factual context for the Court's legal conclusions.

### SECTION 545(D) AND CORRELL'S THEORIES OF RELIEF

The statute at issue, Section 545(D), provides in relevant part that:

> [t]he State Board shall certify the results of the presidential primary to the state chairman. If the party has determined that its delegates and alternates will be selected pursuant to the primary, the slate of delegates and alternates of the candidate receiving the most votes in the primary

shall be deemed elected by the state party unless the party has determined another method for allocation of delegates and alternates. <u>If the party has determined to use another method for selecting delegates and alternates, those delegates and alternates shall be bound to vote on the first ballot at the national convention for the candidate receiving the most votes in the primary unless that candidate releases those delegates and alternates from such vote.</u>

**Va. Code** § 24.2-545(D) (emphasis added). Violation of Section 545(D) is a Class 1 misdemeanor that subjects an offender to "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." (Am. Compl., ECF No. 20, ¶ 15; Answer, ECF No. 24, ¶ 15) (relying on **Va. Code** §§ 24.2-18.2-11(a); 24.2—1017). Section 545(D) has been part of the Virginia Code since 1999. **SB 1287** (Va. 1999). At the outset of the case, Correll presented two related but independent theories of relief.

Correll's first theory argued that RNC Rule 38 - on its own or in conjunction with RNC Rule 37 - guarantees that Correll, as a delegate to the 2016 Republican National Convention, is free to vote his "conscience" ("that is, [to vote] for the person ... he believes to be the best candidate"). (Pl.'s Mem. in Supp. of Mtn. for Temporary Restraining Order and Preliminary Injunction, ECF No. 5, 4) ("Pl.'s Mem."). According to Correll, Section 545(D) is unconstitutional because it trenches on his First

13

Amendment right to vote his conscience pursuant to RNC Rules 37 and 38. (Pl.'s Mem. 2-3, 8-9; Pl.'s Reply in Supp. of Mtn. for Preliminary Injunction, ECF No. 36, 5-10 ("Pl.'s Reply")). RNC Rule 37 provides, in relevant part:

> In the balloting, the vote of each state shall be announced by the chairman of such state's delegation, or his or her designee, and in case the vote of any state shall be divided, the chairman shall announce the number of votes for each candidate, or for or against any proposition; but if exception is taken by any delegate from that state to the correctness of such announcement by the chairman of that delegation, the chairman of the convention shall direct the roll of members of such delegation to be called, and then shall report back the result to the convention at the conclusion of balloting by the other states. The result shall then be recorded in accordance with the vote of the several delegates in such delegation.

(Joint Ex. 1, p. 20). RNC Rule 38 provides:

> No delegate or alternate delegate shall be bound by any attempt of any state or Congressional district to impose the unit rule. A "unit rule" prohibited by this section means a rule or law under which a delegation at the national convention casts its entire vote as a unit as determined by a majority vote of the delegation.

(Joint Ex. 1, p. 21).

Correll's second theory argued that delegates to the Republican National Convention have a right to vote in accordance with the rules promulgated by the national Republican Party (as implemented by the state Republican parties) and that

the rules of the national Republican Party require that Virginia's delegates vote proportionally based upon the percentage of votes that candidates received during Virginia's March 1, 2016 primary election. (Pl.'s Mem. 3-4; Pl.'s Reply 3-5). Correll's second theory is based on three subsections of RNC Rule 16. First, there is RNC Rule 16(a)(1), which provides that:

> Any statewide <u>presidential preference vote</u> that <u>permits</u> a <u>choice among candidates</u> for the Republican nomination for President of the United States <u>in a primary</u>, caucuses, or a state convention <u>must be used to allocate and bind</u> the state's <u>delegation</u> to the national convention <u>in either a proportional or winner-take-all manner</u>, except for delegates and alternate delegates who appear on a ballot in a statewide election and are elected directly by primary voters.

(Joint Ex. 1, p. 12) (emphasis added). Next, RNC Rule 16(a)(2) requires that, at the convention, each delegate's vote is to be announced and recorded in accord with "the delegation's obligation under these rules, state law, or state party rule." <u>Id.</u> Rule 16(c)(2) provides that:

> Any presidential primary, caucus, convention, or other process to elect, select, allocate, or bind delegates to the national convention that <u>occurs prior to March 15</u> in the year in which the national convention is held <u>shall provide for the allocation of delegates on a proportional basis</u>.

(Joint Ex. 1, p.2) (emphasis added. According to Correll,
Section 545(D) is also unconstitutional because it trenches on
those First Amendment associational rights. (Pl.'s Mem. 8-9).[9]

### CONCLUSIONS OF LAW

Before turning to the merits, it is necessary to resolve
the jurisdictional challenges raised by the Defendants and by
the Intervenors. After resolving jurisdictional challenges, this
opinion addresses the merits of the case and the request for
injunctive relief. Finally, the Court addresses and rejects the
contention that Correll's prayer for injunctive relief is barred
by the equitable doctrine of laches.

## I.    JURISDICTION

"Article III of the Constitution limits the jurisdiction of
federal courts to 'Cases' and 'Controversies.'" Susan B. Anthony
List v. Driehaus, 134 S. Ct. 2334, 2342 (2014) (internal
quotations omitted); **U.S. Const.**, Art. III, § 2. Defendants and
Intervenors raise two case-or-controversy doctrines: standing

---

[9] At the time he filed his initial memorandum in support of a
preliminary injunction, Correll appeared to favor the RNC Rule
38 conscience theory over the RNC Rule 16 proportionality
theory. (E.g., Pl.'s Mem. 8-9). However, Correll's reply brief
emphasized the RNC Rule 16 proportionality theory over the Rule
38 conscience theory. (Pl.'s Reply 12-21). At the hearing,
Correll's expert evidence again emphasized the RNC Rule 38
conscience theory and the ways in which Republican rules had
been interpreted at previous conventions to confer that right on
delegates. (Tr. Jul. 7, 2016 32:13-33:16, 44:10-53:7).

and ripeness. Jurisdictional issues must be resolved before evaluation of the merits.

## A. Standing

The test for standing is well-settled. As explained by the Supreme Court,

> [t]he doctrine of standing gives meaning to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process." ... To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." ... "'The party invoking federal jurisdiction bears the burden of establishing' standing."

Susan B. Anthony List, 134 S. Ct. at 2342 (internal citations omitted).

### 1. Injury

In a typical case alleging past injury, "[a]n injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Susan B. Anthony List, 134 S. Ct. at 2341 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)); see also, e.g. Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016), as revised May 24, 2016. However, a somewhat different formulation of injury applies in the pre-enforcement context.

17

Under this approach, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Id. (internal quotations omitted).

> One recurring issue in our cases is determining when the threatened enforcement of a law creates an Article III injury. When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law .... Instead, we have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent. Specifically, we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."

Id. at 2342 (internal citations omitted) (emphasis added). This is especially so where there is a serious prospect that free speech will be chilled and that a plaintiff's First Amendment rights are in jeopardy. Thus,

> [e]ven where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

Sec'y of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984) (emphasis added); see also Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013). Accordingly, "[i]n First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship,' which occurs when a claimant is chilled from exercising h[is] right to free expression." Cooksey, 721 F.3d at 235.

In sum, a plaintiff may bring a pre-enforcement suit when he (1) "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest," but (2) that conduct is "proscribed by a statute," and (3) "there exists a credible threat of prosecution" under that statute. Susan B. Anthony List, 134 S. Ct. at 2342 (internal quotations omitted).

As for the first and second requirements, Correll has proven that he intends to engage in First and Fourteenth Amendment-protected conduct at the 2016 Republican National Convention, and that this intended course of conduct is circumscribed by Section 545(D). (Am. Compl., ¶¶ 21, 42-55) ("Correll will not vote for Donald Trump on the first ballot or any other ballot.").[10] Although early First Amendment standing

---

[10] Correll also notes that the chilling effect of Section 545(D) may threaten the rights of the broader delegation because RNC Rule 17 states that a state delegation which acts contrary to

law taught that it is insufficient to state that a person "desires" to engage in protected activity, e.g., Younger v. Harris, 401 U.S. 37, 57-59 (1971) (Brennan, J., concurring), more current decisions plainly acknowledge that it is sufficient to plead intent to engage in specific conduct proscribed by the statute in question, regardless of whether a plaintiff has engaged in such conduct in the past. E.g., Susan B. Anthony List, 134 S. Ct. at 2343 ("COAST has alleged that it previously intended to disseminate materials criticizing a vote ... and that it 'desires to make the same or similar statements' ... Because petitioners' intended future conduct concerns political speech, it is certainly 'affected with a constitutional interest'") (internal citations omitted); North Carolina Right to Life v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999) ("NCRL") ("NCRL has stated that it wants to distribute these guides in the future, and would do so but for its fear that it would fall within" the operative statute) (emphasis added). Because Correll has established intent to commit a specific act that is

---

Rule 16(c)(2) – that is to say, voting in a non-proportional manner despite holding a primary before March 15, 2016 – the Virginia delegation will be slashed by fifty percent. (Pl.'s Reply 15). Because this speaks more to the rights of the 49 delegates as a whole, because the Court has not certified a class in this action, and because Correll has alleged a sufficient injury by way of chilling of his individual speech and associational rights, it is not necessary to reach this argument.

circumscribed by the statute in question, he satisfies the first two requirements for pre-enforcement review.

The final requirement for pre-enforcement injury, "credible threat of prosecution," is also satisfied in this case. The subjective chill of a criminal statute, absent any other government activity,

> is not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm ... save in rare cases involving core First Amendment rights .... Even in the area of First Amendment disputes, the Supreme Court has generally required a <u>credible threat of prosecution</u> before a federal court may review a state statute.

Doe v. Duling, 782 F.2d 1202, 1206-07 (4th Cir. 1986) (emphasis added) (relying on Laird v. Tatum, 408 U.S. 1, 13-14 (1972)).

Proving "credible threat of prosecution" requires a showing that

> one's First Amendment activities have been chilled. Subjective or speculative accounts of such a chilling effect, however, are not sufficient. Any chilling effect must be objectively reasonable .... Government action will be <u>sufficiently chilling</u> when it is <u>likely to deter a person of ordinary firmness from the exercise of First Amendment rights</u>.

Cooksey, 721 F.3d at 235-36 (relying on Benham v. City of Charlotte, 635 F.3d 129, 135 (4th Cir. 2011)) (emphasis added).[11]

---

[11] The unconstitutional chill <u>itself</u> is an injury, where fear of prosecution is objectively reasonable. Cooksey, 721 F. 3d at 226 ("The injuries in this case—a chilling of speech and threat of

Supreme Court decisions on "credible threat of prosecution" teach that there are several factors that may make a chilling effect "objectively reasonable": (1) past enforcement against plaintiff, Susan B. Anthony List, 134 S.Ct. at 2345; (2) official threats of enforcement made specifically against plaintiff, Steffel v. Thompson, 415 U.S. 452, 455-56 (1974); and (3) frequency of enforcement against similarly situated persons, Susan B. Anthony List, 134 S.Ct. at 2345; Holder v. Humanitarian Law Project, 130 S.Ct. 2705, 2717 (2010); Steffel, 415 U.S. at 458-59.[12]

The first and third factors are not at issue here. The Commonwealth states, and Correll does not dispute, that Section 545(D) has never previously been enforced against Correll or any other person. (ECF No. 25, Ex. 2, 3). The second factor necessitates examination of whether Abrams's letter to Correll creates the type of individualized, particularized reasonable threat of criminal prosecution that would deter a person of ordinary firmness from the exercise of his rights. In Steffel, the plaintiff was "twice warned to stop handbilling ... and has

---

prosecution—were caused directly by the actions of the State Board.")

[12] Moribundity may make a threat of prosecution objectively unreasonable for standing purposes in some cases, e.g., Poe v. Ullman, 367 U.S. 497 (1961), but does not eliminate standing when a government official nevertheless makes a particularized threat of enforcement against a plaintiff. NCRL, 168 F.3d at 710.

been told by the police that if he again handbills at the shopping center and disobeys a warning to stop he will likely be prosecuted." Steffel, 415 U.S. at 458-59. The Supreme Court held that those police warnings, together with the arrest of plaintiff's partner in handbilling, were objectively chilling. Id.

The Fourth Circuit has held that a particularized, objectively chilling threat of enforcement may arise from informal correspondence issued by a state official. E.g., Cooksey, 721 F.3d at 237; NCRL, 168 F.3d at 709-11. In NCRL, the plaintiff became concerned that it might be subject to a state election law regulating corporate expenditures for political purposes. NCRL, 168 F.3d at 709. NCRL wrote to the Chief Deputy Director of the State Board of Elections to request her opinion, enclosing samples of the literature it sought to distribute. Id. The director "informed NCRL that the distribution of this [literature] would violate the State's prohibition against corporate expenditures for a political purpose." Id. In assessing the credible threat of prosecution, the Fourth Circuit noted that the statute in question:

> appears by its terms to apply to NCRL ....
> More importantly, NCRL has stated that it
> wants to distribute these guides ... and
> would do so but for its fear that it would
> fall within North Carolina's definition of
> political committee. To determine whether
> that fear was well-founded, NCRL wrote to

23

> the State Board of Elections. <u>The State did
> not indicate that it would interpret the
> statute to mean anything other than what its
> plain language would suggest</u>. As a result,
> NCRL refrained from disseminating its guide,
> and its speech was chilled.

<u>Id.</u> at 710 (emphasis added). Once the Board of Elections official sent the initial communication stating that NCRL's conduct would fall within the scope of the statute, neither (1) the fact that the State adopted a post-litigation position that it would not interpret the statute to cover NCRL nor (2) the fact that, "in the twenty-five years since the statute's enactment, [the Board] has never interpreted it to apply to groups" in NCRL's position rendered NCRL's fear of prosecution objectively unreasonable. <u>Id.</u> at 710-11.

In its relevant parts, this case is much the same as <u>NCRL</u>. Correll became concerned that his intended conduct might subject him to prosecution under Section 545(D). (Compl. ¶¶ 21-25; Joint Stip. ¶¶ 20-26). Correll wrote to the Board of Elections and to Abrams to request their opinions. (Compl. ¶¶ 25-26, 28-29; Joint Stip. ¶¶ 20-26).[13] The Board of Elections did not respond (Compl. ¶ 26, 28-29; Joint Stip. ¶¶ 20-26), but Abrams provided a letter stating in relevant part that:

---

[13] Donald Trump is not a Commonwealth official, and his thoughts on whether Correll may or may not be prosecuted based in part on Section 545(D) (Compl. ¶¶ 30-31; Commonwealth's Resp. 19) are irrelevant to a "credible threat of prosecution" analysis.

> My office generally does not respond to
> requests for legal opinions about
> potentially criminal conduct .... However,
> as you are aware the first rule of statutory
> construction dictates that we are to
> interpret the words of a statute using the
> ordinary meaning of the language in the
> statute. The plain meaning of the statute
> you cite, Va. Code[] § 24.2-545(D) would
> appear clear.
>
> I refer you to consult private counsel for
> an opinion as to issues such as
> jurisdiction, venue, potential penalties,
> etc.

(Compl. ¶ 27, ECF No. 25, Ex. 1, 4). This letter does not state

outright, as in NCRL, that Correll's intended conduct "would

violate" the statute. NCRL, 168 F.3d at 709. However, because

Section 545(D) clearly states that "delegates and alternates

shall be bound to vote on the first ballot at the national

convention for the candidate receiving the most votes in the

primary unless that candidate releases those delegates and

alternates from such vote," the Court finds that an objectively

reasonable person would read Abrams's letter, in conjunction

with the plain, unambiguous text of Section 545(D), as stating

that Correll's proposed course of conduct would violate Section

545(D).

Defendants raise two arguments relating to credible threat

of prosecution: (1) that the Commonwealth has no plans to

prosecute Correll, and (2) that state law on the long-arm reach

of criminal statutes would not permit prosecution of Correll.

(Tr. Jul. 7, 2016 211:23-212:7; Def.'s Resp. 16-19; ECF No. 38; ECF No. 25, Ex. 1, 3).

First, Defendants state that the Commonwealth has not, to its knowledge, ever applied Section 545(D) against a party or delegate; additionally, both Abrams and Hudson state that they do not intend to prosecute Correll or any other delegate for violating Section 545(D). (Def.'s Resp. 18-19; ECF No. 38; ECF No. 25, Ex. 1, 3).[14] It is true, as Defendants and Intervenors note, that a history of enforcement (or non-enforcement) against similarly situated persons is relevant to a credible threat of prosecution. E.g., Susan B. Anthony List, 134 S.Ct. at 2345; Holder, 130 S.Ct. at 2717; Steffel, 415 U.S. at 458-59; cf. Poe, 367 U.S. at 497. However, as NCRL makes clear, where an official originally stated that the intended conduct would be subject to prosecution, neither (1) post-litigation disavowal of

---

[14] (ECF No. 38) ("I believe that there would be serious difficulties in prosecuting a delegate ... I do not anticipate circumstances that would compel ... the Office of the Attorney General to prosecute Mr. Correll or any other Republican delegate for ... conduct in their capacity as a delegate"); ECF No. 25, Ex. 1, 3) ("I do not intend to prosecute Mr. Correll or any other Republican delegate for their conduct at the 2016 Republican National Convention in Ohio").

At the conclusion of the hearing, Correll's counsel briefly argued that Hudson's statement that she does "not anticipate circumstances" that would compel prosecution is not an unequivocal statement of non-prosecution. (Tr. Jul. 7, 2016 230:5-231:20). Because post-litigation disavowal of prosecutorial intent is not dispositive, NCRL, 168 F.3d at 710, the Court need not decide whether Hudson's statement is an unequivocal disavowal.

prosecutorial intent[15] nor (2) historical non-enforcement against a similarly situated group can ameliorate the credible threat of prosecution. NCRL, 168 F.3d at 710. Because Abrams's letter conveyed that Correll's intended actions were subject to prosecution, neither these post-litigation positions disclaiming prosecutorial intent nor historical non-enforcement of Section 545(D) renders Correll's fear of prosecution objectively unreasonable.

Second, Defendants argue that Correll's fear of criminal prosecution is not objectively reasonable because the "traditional view of criminal jurisdiction in Virginia requires that the crime occur within the Commonwealth," and Correll intends to engage in expressive conduct in Ohio. (Def.'s Resp. 17) (relying on **Va. Code** § 19.2-239; Farewell v. Com., 167 Va. 475, 479 (1937)). This argument is inconsistent with Defendants' own characterization of the law and of the harms they suggest that Correll's conduct might cause.

Defendants note that, "[i]n recent years, Virginia courts have established room to prosecute an offense not fully executed

---

[15] "NCRL is left ... with nothing more than the State's promise that NCRL's officers will face no criminal officers .... NCRL's First Amendment rights would exist only at the sufferance of the State Board of Elections. It has no guarantee that the Board might not tomorrow bring its interpretation more in line with the provision's plain language. Without such a guarantee, NCRL will suffer from the reasonable fear that it can and will be prosecuted .... And its constitutionally protected speech will be chilled as a result." NCRL, 168 F.3d at 710-11.

in Virginia but resulting in immediate harm within the
Commonwealth .... In such cases where actual physical presence
is necessary, Virginia still must be the place where evil
results." (Def.'s Resp. 17-18) (relying on Foster-Zahid v. Com.,
23 Va. App. 430, 440 (1996)); (Pl.'s Reply 19-20 (relying on
Jaynes v. Com., 276 Va. 443, 452 (2008) (noting that the state
"may exercise jurisdiction over criminal acts that are committed
outside the state, but are intended to, and do in fact, produce
harm within the state"); Kelso v. Com., 282 Va. 134, 138 (2011)
(noting that crimes may also be prosecuted in Virginia when
criminal intent is formed in Virginia). Defendants also state
that, if Correll votes in a manner contrary to the Virginia
primaries, Correll will cause harm in Virginia: rendering "the
Commonwealth's financial and administrative investment a waste,"
depriving "the Commonwealth of the consideration for the
Commonwealth's expenditure of resources in holding the primary,"
undermining "confidence in the integrity of the electrical
process," undermining "participatory democracy" and destroying
voter confidence, and cancelling out "more than a million
votes." (Def.'s Resp. 13-14).[16] In other words, Defendants insist
that Correll's conduct in Ohio (not voting for the candidate who

---

[16] As noted in greater detail in the merits discussion, this
interest in holding a primary does not create a constitutionally
cognizable interest in regulating the conduct of a party
convention under Democratic Party of the United States v. La
Follette, 450 U.S. 507, 124 (1981).

received the most votes in the primary) will be felt in
Virginia. Defendants' characterization of Virginia law and the
harm they assert in their briefs acknowledges that: (1) the
Commonwealth may prosecute breaches of Virginia statutes
performed outside the Commonwealth when the harm is felt in
Virginia; and (2) breach of Section 545(D) will create harm felt
in Virginia. Accordingly, by Defendants' own characterization of
Virginia law, Correll could be prosecuted, which supports the
credibility of a credible threat of prosecution.

Defendants may or may not be correct about the reach of
Virginia's jurisdiction or about whether convention voting in
Ohio might produce the harms described in Virginia. However, the
fact that Defendants made such an argument augurs that
objectively reasonable people would consider Correll's conduct
in Ohio prosecutable in Virginia's criminal courts, and thus
reasonably would consider the threat of prosecution to be
credible.

Two additional points also make it objectively reasonable
to believe that voting contrary to Section 545(D) in another
state would subject Correll to prosecution. First, such a
finding is consistent with Abrams's note referring Correll to
private counsel for "issues such as jurisdiction." (Compl. ¶ 27,
ECF No. 25, Ex. 1, 4). Second, as Correll points out, "[i]t
would be unreasonable to assume the General Assembly adopted

[the statute] without intending that it be enforced." (Pl.'s Reply 19) (relying on Am. Bookseller's Ass'n, Inc. v. Virginia, 802 F.2d 691, 694 n.4 (4th Cir. 1986)).

In conclusion, Correll has shown the three basic requirements for pre-enforcement standing in a First Amendment context, and neither Defendants nor Intervenors have dislodged the credibility of Abrams's initial threat of prosecution.

### 2. Causation and Redressability

To establish standing, a plaintiff must also establish "a sufficient causal connection between the injury and the conduct complained of" and "a [likelihood] that the injury will be redressed by a favorable decision." Susan B. Anthony List, 134 S. Ct. at 2342 (internal quotations omitted).

Defendants argue that the true cause of Correll's injury is not Section 545(D), but, instead either: (1) RPV's own rules, to which Correll bound himself by way of the Declaration; or (2) the RPV's choice to hold a state-funded primary in which voters selected candidates rather than directly selecting delegates. (Def.'s Resp. 23-24). On this basis, Defendants argue that Section 545(D) is not the cause of Correll's injury but, rather, that Correll's own choices or the choices of the RPV caused the injury for which Correll presently seeks redress.

**a. RPV's Choices in Potentially Submitting to Section 545(D) are not the Source of Correll's Injury, because the Present Conflict is between the RNC Rules and Section 545(D), and the RNC has not Voluntarily Submitted to Section 545(D)**

Defendants cite <u>24th Senatorial Dist. Republican Comm. v. Alcorn</u>, 820 F.3d 624 (4th Cir. 2016) and <u>Marshall v. Meadows</u>, 105 F.3d 904 (4th Cir. 1997) for the proposition that, where an alleged injury is caused by a party's voluntary choice, the injury is not caused by the Commonwealth and cannot be redressed by a ruling against the Commonwealth. (Def.'s Resp. 20). As Defendants' argument goes: (1) RNC Rule 16(a)(1) permits a state party such as RPV to choose between a winner-take-all and proportional primary; (2) RPV chose to hold a proportional contest in which voters would vote for candidates, rather than delegates; and (3) Section 545(D) only applies when the state party chooses to hold a state-funded contest in which voters vote for candidates, rather than delegates; such that (4) RPV's choice brought its delegates within the ambit of Section 545(D). (Def.'s Resp. 20-24). In other words: if RPV held elections for delegates rather than candidates, or chose a winner-take-all contest, then Correll would not be injured by any clash between RNC Rule 16 and Section 545(D).

Defendants' reliance on <u>Alcorn</u> and <u>Marshall</u> neglects that this case involves a conflict between the <u>national</u> party rules and a state statute arising from an action of the state party

31

acting in conformance with a national rule, not a conflict between state party rules and a state statute arising from the action of a state party. Both <u>Alcorn</u> and <u>Marshall</u> dealt with cases in which the RPV affirmatively and voluntarily engaged in some action which subjected the party (or a sub-unit of the party) to a state statute,[17] and plaintiffs subsequently alleged a conflict between the party rules and the state statutes. <u>Alcorn</u>, 820 F.3d at 627-28, 630-33; <u>Marshall</u>, 105 F.3d at 905. In both of those cases, it was fair to say that the RPV chose to bring itself under the control of the state law, and it and its sub-units were obliged to live with the constricting consequences of that choice.

In this case, however, the RNC - the entity whose rules are allegedly in conflict with Section 545(D) - has engaged in no affirmative and voluntary act that would submit it to Section 545(D). The RNC has not chosen to subordinate its rules to state statutes,[18] and neither it nor its adherents are subject to the state's attempts to circumscribe the manner in which the RNC carries out its business. This means that there is a very real and very live conflict between RNC Rule 16 and Section 545(D) which is not attributable to the entity whose rules would be

---

[17] Incorporating the Incumbent Protection Act into its own rules in <u>Alcorn</u>; holding an open primary in <u>Marshall</u>.

[18] RNC Rule 14(c) explicitly states that Rule 16 controls in any conflict with state laws. (Joint Ex. 1, p. 11.)

subjugated to the state statute if that state statute were enforced.

Moreover, Alcorn and Marshall cannot be read in a manner that would allow the Commonwealth to encumber a choice that is constitutionally left to the complete discretion of the national party[19] - the conduct of its convention - with a patently unconstitutional condition, even if that condition is only attached to one of multiple possible choices. See, e.g., Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586, 2594 (2013) ("the government may not deny a benefit to a person because he exercises a constitutional right ... an overarching principle, known as the unconstitutional conditions doctrine ... vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."). As explored more fully in the merits discussion, Section 545(D)'s requirement that delegates vote winner-take-all on the first ballot at the convention violates the First Amendment. Defendants' no-causation argument, if accepted, would allow the Commonwealth to accomplish indirectly (by attachment of an unconstitutional limitation to dictate convention voting) that which the Commonwealth cannot do directly (regulate convention voting). Nothing in Alcorn or Marshall permits such a result.

---

[19] See infra Part II.A.

### b. Correll's Contractual Obligations are Not the Source of his Injury

Defendants also argue that Correll's injury does not arise from Section 545(D), but from his contractual obligation – created by the Declaration – to be bound by the proportional primary results. (Def.'s Resp. 23). This argument lacks merit.

To begin, this argument presupposes that Correll has only one claim – his "conscience" claim – because the argument assumes that voting proportionally in accord with the March 1, 2016 primary results would offend Correll's conscience. That is simply contrary to the record. Correll's counsel represented in closing argument that voting according to the Declaration – that is to say, proportionally – would be voting in accordance with Correll's conscience. (Tr. Jul. 7, 2016 225:5-6).

Moreover, RNC Rule 16, requiring proportional voting, is antithetical to Section 545(D), requiring winner-take-all voting. In other words, Section 545(D) is directly in conflict with RNC Rule 16. Section 545(D) requires that all Virginia Republican delegates vote for the candidate who received the most votes in the primary: Donald Trump. Rule 16 requires that the Virginia Republican delegates split their votes proportionally. The obvious chill to Correll's ability to speak and associate in accordance with his party's convention rules originates wholly with Section 545(D).

34

As to Section 545(D) <u>and</u> RNC Rule 16's joint potential conflict with RNC Rules 37 and Rule 38, at least as Correll interprets them, the Commonwealth's causation argument neglects the significant difference between private contracts which seek to circumscribe behavior and state criminal laws which seek to circumscribe behavior, particularly as these relate to a chilling effect. First, the coercive power of the state is simply greater than the power of a private individual or private contract. <u>See e.g.</u>, <u>Engel v. Vitale</u>, 370 U.S. 421, 430 (1962) (recognizing that the "power, prestige and financial support of government" may create an "indirect coercive pressure" to conform in context of school prayer). Second, the state controls a qualitatively different tool – the criminal punishment of incarceration – to command adherence, making laws a significantly greater source of compulsion than could be effectuated by private contract. <u>E.g.</u>, <u>Argersinger v. Hamlin</u>, 407 U.S. 25, 32-33 (1972) (extending Sixth Amendment right to counsel to any charge where defendant faces incarceration).

Where a plaintiff's conduct is proscribed both by civil agreement and criminal statute, the Court cannot conclude that the criminal statute does not exert an additional, and actionable, chill.[20] The Court does not find it unreasonable that

---

[20] <u>E.g.</u>, <u>Cooksey</u>, 721 F. 3d at 226 (noting chilling as injury in First Amendment case).

a plaintiff might be willing to engage in certain conduct when he risks only civil consequences such as an exile from future conventions or party politics, but would be unwilling to engage in the same conduct when he risks criminal prosecution and incarceration. To the extent that this Court can foreclose that additional chilling effect, the Court can provide a remedy to Correll's injury.

In this case, the Court considers Section 545(D) to be a cause of injurious chill above and beyond that of any potential civil consequences associated with RNC Rule 16 and the RPV Declaration. The Court may redress the cause of that injury by enjoining enforcement of Section 545(D). In this case, Correll has standing to challenge Section 545(D) notwithstanding any civil contract he may have signed which independently, but less forcefully, forbids him to engage in his intended conduct. Moreover, Defendants' point simply does not apply at all where, as here, the only claim to be adjudicated is the conflict between RNC Rule 16 and Section 545(D), rather than the conflict between RNC Rules 37 and 38 and Section 545(D).

### 3. Standing to Speak for the Republican Party

Both Defendants and Intervenors challenge Correll's standing on the ground that he cannot speak for the RNC or RPV. (Def.'s Resp. 25-26; Intervenors' Resp., ECF No. 25, 12-14).

There are two significant problems with this argument. First, Correll asserts rights at least partially as an individual delegate. (Am. Compl. ¶¶ 45, 52). Second, as discussed in more depth in the later section assessing likelihood of success on the merits, the speech and associational rights of a party are related to the speech and associational rights of its members, such that a speech or associational injury to the member is, in fact, an injury to the party. E.g., Cousins v. Wigoda, 419 U.S. 477, 478-79 (1975) (permitting plaintiff delegates to assert associational rights and noting that interference with a party is interference with its "adherents"); Bachur v. Democratic Nat'l Party, 836 F.2d 837, 841-42 (4th Cir. 1987).

## B.  Ripeness

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (internal citations omitted). Traditionally, courts consider the "prudential ripeness" factors of: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Cooksey, 721 F.3d at 240 (quoting Nat'l Park Hosp. Ass'n v. Dep't of the

Interior, 538 U.S. 803, 808 (2003)); see also Susan B. Anthony
List, 134 S. Ct. at 2347.[21]

When assessing pre-enforcement First Amendment claims,
fitness and hardship are sometimes established upon finding a
credible threat of prosecution during the standing inquiry.
E.g., Susan B. Anthony List, 134 S. Ct. at 2347; Cooksey, 721
F.3d at 240 ("Our ripeness inquiry ... is inextricably linked to
our standing inquiry"); Doe, 782 F.2d at 1206 n.2 ("Plaintiff's
personal stake in the outcome (standing) is directly limited by
the maturity of the harm (ripeness) .... Both doctrines require
that those seeking a court's intervention face some actual or
threatened injury to establish a case or controversy"). In Susan
B. Anthony List, the Supreme Court noted that:

> In concluding that petitioners' claims were
> not justiciable, the Sixth Circuit
> separately considered two other factors:
> whether the factual record was sufficiently
> developed, and whether hardship to the
> parties would result if judicial relief is
> denied at this stage in the proceedings...
> Respondents contend that these "prudential
> ripeness" factors confirm that the claims at
> issue are nonjusticiable .... But we have
> already concluded that petitioners have
> alleged a sufficient Article III injury. To
> the extent respondents would have us deem
> petitioners' claims nonjusticiable on
> grounds that are 'prudential,' rather than
> constitutional, [that] request is in some

---

[21] Additionally, ripeness considerations are relaxed in First
Amendment cases because chilling may result in irreparable loss.
Cooksey, 721 F.2d at 240 (relying on New Mexicans for Bill
Richardson v. Gonzales, 64 F.3d 1495, 1500 (10th Cir. 1995).

> tension with our recent reaffirmation of the
> principle that a federal court's obligation
> to hear and decide cases within its
> jurisdiction is virtually unflagging.
>
> In any event, we need not resolve the
> continuing vitality of the prudential
> ripeness doctrine in this case because the
> "fitness" and "hardship" factors are easily
> satisfied here. First, petitioners'
> challenge to the Ohio false statement
> statute presents an issue that is purely
> legal, and will not be clarified by further
> factual development ... And denying prompt
> judicial review would impose a substantial
> hardship on petitioners, forcing them to
> choose between refraining from core
> political speech on the one hand, or
> engaging in that speech and risking costly
> Commission proceedings and criminal
> prosecution on the other.

Susan B. Anthony List, 134 S. Ct. at 2347. Similarly, in

Cooksey, the Fourth Circuit noted that, where a credible threat

of prosecution existed, the plaintiff would face hardship (the

"significant impediment" of either adjusting his conduct or

risking criminal prosecution) if the court did not promptly

adjudicate his constitutional claims. Cooksey, 721 F.3d at 240-

41.

### 1. The Conflict Between Section 545(D) and RNC Rule 16 is Fit for Adjudication

As respects the conflict between Section 545(D) and RNC

Rule 16, fitness and hardship are, as in Susan B. Anthony List

and Cooksey, clearly established by the earlier finding of

credible threat of prosecution. As to fitness, the text of RNC

Rule 16 (requiring that Virginia's delegation vote proportionally because Virginia held a primary prior to March 15, 2016) is clearly at odds with Section 545(D) (requiring that Virginia's delegation cast all of its votes for Donald Trump). The meanings of the rule and the statute are clear on their respective faces, and both the rule and the statute are presently in force. As to hardship, Correll, having been faced with a credible threat of prosecution, must adjust his conduct or risk prosecution.

### 2. The Conflict Between Section 545(D) and RNC Rules 37 and/or 38 is Not Fit for Adjudication

As respects the conflict between Section 545(D) and RNC Rules 37 and 38, however, there is a complication not present in Susan B. Anthony List or Cooksey that makes this issue unfit for immediate resolution: the RNC has not actually adopted RNC Rules 37 or 38 for the 2016 National Convention. (Tr. Jul. 7, 2016 36:2-39:7; 135:8-136:2). Although RNC Rules 37 and 38 may have existed in various guises at nearly every Republican National Convention since 1880 (Pl.'s Reply 5-10; Tr. Jul. 7 2016 54:3-56:8), the undisputed record here is that RNC Rules 26 through 42 presently have no effect, and that, if they are not adopted at the 2016 Republican National Convention, they may never have any effect. (Tr. Jul. 7 2016 36:2-39:7, 135:8-136:2).

The decision of the Supreme Court in Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998) is instructive here. In that case, the Supreme Court Held that a Forest Service "Land and Resource Management Plan" which contemplated increased logging was not the sort of final decision that was ripe for challenge because, before the logging to which the plaintiffs objected might occur, the Forest Service had to jump through various hoops, including providing affected parties with notice and opportunity to be heard and making a final decision which would itself be amenable to administrative and judicial appeals. Id. at 734. Although the existence of the Plan at the time of suit made it "more likely" that the complained-of logging would someday occur, any dispute over the Plan's contents could not be ripe until the Plan was incorporated into a final agency action. Id. at 730. Until that final agency action occurred, it was possible that the Forest Service might "revise the Plan or modify the expected methods of implementation" in a way that obviated the plaintiffs' grievances, rendering review at the time of the suit unnecessary. Id. at 736.

The analogy is not a perfect one, in that the Forest Service Plan was an agency action allegedly at odds with controlling statutes, id. at 731, while Section 545(D) is a statute allegedly at odds with allegedly controlling RNC Rules 37 and 38. But there is a common characteristic that makes both

41

Case 3:16-cv-00467-REP   Document 43   Filed 07/11/16   Page 42 of 65 PageID# 1220

disputes unfit for judicial review: one side of the alleged conflict is not yet finalized. RNC Rules 37 and 38, like the Forest Service Plan, sketch out a course of action but do not have any force until they are formally adopted at the 2016 Republican National Convention. Additionally, although RNC Rules 37 and 38's presence in the temporary rules and their historic presence in the Rules of the Republican Party (Tr. Jul. 7, 2016 36:2-39:7) make adoption of RNC Rules 37 and 38 more likely – in the same manner that the Plan's existence made final action more likely than if the Plan did not exist – it is still possible that RNC Rules 37 and 38 will be modified or deleted in a way that creates no actionable conflict with Section 545(D).

On this basis, the Court departs from Susan B. Anthony List and Cooksey: any attempt to resolve an alleged conflict between Section 545(D) and RNC Rules 37 and 38 would require speculation because RNC Rules 37 and Rule 38 are not now in effect. They are merely proposed rules that might be altered or even deleted at the 2016 Republican National Convention. Ohio Forestry Ass'n teaches that, when one side of a conflict is so uncertain in its terms and enforceability, the conflict is not fit for judicial decision, and not ripe for adjudication.

Because the Court lacks jurisdiction over any alleged conflict between Section 545(D) and RNC Rules 37 and 38, the Court makes no finding about the constitutionality of Section

42

545(D) with respect to RNC Rules 37 or 38. In light of case-or-controversy restraints, the Court will proceed to assess Correll's claims in Counts I and II only on the basis of an alleged conflict between Section 545(D) and RNC Rule 16.

## II.   MERITS OF THE RNC RULE 16 CLAIM

### A.   The Conflict between Section 545(D) and RNC Rule 16 Creates Unconstitutional Harms to Correll, such that Declaratory Judgment is Appropriate

The Supreme Court has long held that "political belief and association constitute the core of those activities protected by the First Amendment." Elrod v. Burns, 427 U.S. 347, 356 (1976). That principle applies with particular force to protect the First Amendment rights of speech and association of political parties and their members, especially in the process of nominating candidates for President and Vice-President of the United States. Cousins, 419 U.S. at 487. Thus, as the Supreme Court explained in Cousins:

> There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments .... The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.

Cousins, 419 U.S. at 477 (citing Kusper v. Pontikes, 414 U.S. 51, 56-57 (1973)).[22]

Moreover, "[i]t is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny." Id. at 362 (citing Buckley v. Valeo, 424 U.S. 1, 64-65 (1976); NAACP v. Alabama, 357 U.S. 449, 460-61 (1958)). "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct[.]" Buckley, 424 U.S. at 65. Thus, an encroachment on the right of association "cannot be justified upon a mere showing of a legitimate state interest." Kusper, 414 U.S. at 58. Rather, the interest advanced by the state "must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest," and the means chosen to effect that interest must be narrowly tailored to do so.[23]   Elrod, 427 U.S. at 362. Therefore

---

[22] By virtue of the Fourteenth Amendment, these First Amendment precepts apply fully to the States. Id.

[23] Defendants contend that the Court should apply the less exacting standard set forth in Anderson v. Celebrezze, 460 U.S. 780 (1983) and refined in Burdick v. Takushi, 504 U.S. 428 (1992) ("the Anderson/Burdick framework"), because that framework applies to all "[c]onstitutional challenges to state election laws." (Def.'s Resp. 5).
It is true that the Anderson/Burdick framework has been applied to a variety of constitutional claims in the election law context, and that the broad language found in those

where, as here, the Commonwealth seeks to impose its will on a political party and its adherents by statute, the Commonwealth must establish that the statute is narrowly tailored to achieve a compelling state interest. La Follette, 450 U.S. at 124 (citing Cousins, 419 U.S. at 489; NAACP v. Alabama, 357 U.S. at 463).

The foregoing principles guide the analysis of Correll's contention that Section 545(D) offends his First Amendment rights of speech and association by requiring him to vote in contravention of the RNC Rules.

---

decisions could be read to reach Correll's claims here. However, the animating principle behind decisions applying that framework, which is "that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder," does not apply here. Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997). In this case, the statute at issue purports to regulate delegates' behavior at a party's national convention, which is neither an election nor a campaign and in which states have, at best, a minimal interest. See Cousins, 419 U.S. at 489. Decisions that directly confront the issue presented here, i.e., whether to "accord[] primacy to state law over the National Political Party's rules in the determination of the qualifications and eligibility of delegates to the Party's National Convention," uniformly apply strict scrutiny. Id.; see also Democratic Party of the United States v. Wisconsin ex rel. La Follette, 450 U.S. 107 (1981). Therefore, the Court declines to apply the Anderson/Burdick framework and proceeds directly to the strict scrutiny analysis. In any event, even if the Anderson/Burdick framework applied (which it does not), the burden imposed on Correll's associational right is severe, requiring the application of strict scrutiny, even under the Anderson/Burdick approach. Therefore, the application of that test would not affect the analysis herein.

### 1.   The Burden Imposed by Section 545(D)

The burden in this case is that Correll faces a threat of criminal prosecution under Section 545(D) if he exercises his First Amendment rights to speech and association by voting in accord with the RNC Rules and RPV's Rule 16(f) Filing at the 2016 Republican National Convention.[24] (Am. Compl. ¶¶ 22-23.) Specifically, RNC Rule 16(c)(2), which is mirrored by RPV's Rule 16(f) Filing, requires that all states that held presidential preference primaries on or before March 15, 2016 allocate their delegates' votes proportionally at the 2016 Republican National Convention. (Joint Ex. 1, p. 12; Joint Ex. 3). Moreover, RNC Rule 17(a) provides that "[i]f any state or any state Republican party violates Rule No. 16(c)(2), the number of delegates and the number of alternate delegates to the national convention from that state shall each be reduced by fifty percent (50%)." (Joint Ex. 1, p. 15). In that event, the Convention will allocate the remaining delegates' votes proportionally among candidates "who received more than 10% of the votes cast in such primary." (Joint Ex. 1, p. 15).

Section 545(D) requires that, where the party holds a presidential primary election to determine the preference of the

---

[24] The Declaration that Correll signed upon being selected as a delegate also obligates him to vote in accordance with party rules. (Joint Ex. 5). Thus, compliance with Section 545(D) not only forces Correll to violate party rules, but also prevents him from performing his contractual obligation as a delegate.

voters, but chooses to select delegates by local convention, all delegates to the national convention are bound to vote for the candidate who received the most votes in the primary on the first ballot. In other words, Section 545(D) mandates a "winner-take-all" result that is squarely at odds with RNC Rule 16(c)(2), thereby subjecting the Virginia delegation to the reduction-by-half penalty of Rule 17(a) and allowing Virginia's votes to be allocated by the Convention in accordance with RNC Rule 17(b).[25] Thus, Correll faces the unenviable choice of (1) voting pursuant to his party's requirements (RNC Rules 16 and 17, RPV's 16(f) Filing, and the Declaration) but facing a risk of criminal prosecution under Section 545(D); or (2) voting in accordance with the statute, but violating his pledge and the party rules and facing the risk of losing his opportunity to participate in the 2016 Republican National Convention at all.

Supreme Court precedent clearly teaches that, given these facts, Section 545(D) creates a severe burden on Correll's First Amendment rights. To begin, it is well-settled that "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957). That premise follows

---

[25] As Correll points out, "no matter how the first-ballot votes are allocated among the delegate[s] ... in a proportional allocation 32 of the 49 Virginia delegates will cast votes that violate Section 545(D)." (Pl.'s Reply, 15).

necessarily from the basic fact that a political party does not exist separate and apart from its members.[26]

It is equally well-settled that "[a] political party [and, per Sweezy, its adherents] has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." New York State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 202 (2008) (internal citations omitted); see also California Democratic Party v. Jones, 530 U.S. 567, 575 (2000) (citing Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 224 (1989)) ("Unsurprisingly, our cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'selects a standard bearer who best represents the party's ideology and preferences.'"); Nelson v. Dean, 528 F. Supp. 2d 1271, 1280 (N.D. Fla. 2007) ("the right to associate (or not to associate) with proposed national political convention delegates is very

---

[26] Analogously, the National Convention does not exist separate and apart from the delegates and party members who comprise it. Bachur, 836 F.2d at 841-42 (noting that "[d]elegates for practical purposes constitute the National Party — they make its rules, adopt its platform, provide for its governance, as well as nominate candidates."). Thus, for purposes of this analysis, there is no meaningful distinction between the party's associational right to select a presidential nominee at the National Convention, discussed further below, and the delegates' rights to associate in doing so.

near the First Amendment association right's core."). In other words, the right of political association endows the party with plenary discretion concerning the "decisions about the identity of, and the process for electing, its leaders." Eu, 489 U.S. at 229.

Accordingly, "a political party may ordinarily decide for itself how delegates to its national convention will be chosen, and the party ordinarily need not comply with state laws purporting to restrict its options." Nelson, 528 F. Supp. 2d at 1277; see also La Follette, 450 U.S. at 124 ("A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution."); Cousins, 419 U.S. at 489 ("Delegates perform a task of supreme importance to every citizen of the Nation regardless of their State of residence.").

These decisions also teach that First Amendment rights for parties and their adherents are particularly strong in the context of the nomination and selection of the President and Vice-President of the United States because "[t]he States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates." Cousins, 419 U.S. at 489. They also teach that allowing an individual state to impose restrictions on how conventions are conducted without respect for party policy is

49

"an obviously intolerable result." Id. at 490. That is certainly so where the state statute dictates how delegates must discharge the most important duty of all – voting for candidates – and does so in direct contradiction of the party rules.

The Supreme Court's decision in La Follette is particularly instructive. Under Wisconsin's "open primary" law, a voter could participate in a party primary without registering as a party member or otherwise declaring a party preference. La Follette, 450 U.S. at 110-11. Wisconsin law, like the statute at issue here, required Wisconsin's delegates to the national convention to vote in accordance with the primary results on the first ballot. Id. at 112. The National Democratic Party's rules, however, provided that only voters who publicly declared their allegiance to the Democratic Party could participate in primaries or caucuses that were part of the delegate selection process. Id. at 109-110. The state attorney general brought an original action in the Wisconsin Supreme Court against the national party and the Democratic National Committee asserting the primacy of state law over the delegate selection rules. Id. at 113. The Wisconsin Supreme Court entered a declaratory judgment in the state's favor and held that the national convention was required to seat the Wisconsin delegation even though it had been selected in violation of the party's rules. Id. The Supreme Court reversed, reiterating its previous holding

in Cousins that a national party's delegate selection rules are protected by the First Amendment right to freedom of association and thus could be overridden only based on a compelling state interest. Id. at 120-22.

Other cases, both in the Supreme Court and the Courts of Appeals, have reached similar results. See, e.g., O'Brien v. Brown, 409 U.S. 1 (1972) (staying Court of Appeals' injunction requiring the Democratic convention to seat California delegation selected in winner-take-all primary as mandated by state law); Bachur, 836 F.2d at 837 (rejecting challenge to party's gender allocation rule for delegates); Wymbs v. Republican State Exec. Comm., 719 F.2d 1072 (11th Cir. 1983) (noting a party's First Amendment right to control its own delegate selection process and reversing, on justiciability grounds, an injunction requiring the Republican party to select Florida delegates based on a one-Republican-one-vote principle); Ferency v. Austin, 666 F.2d 1023 (6th Cir. 1981) (holding that a state statute requiring selection of delegates to the national convention in accordance with the results of an open primary could not be enforced to the extent that it contravened party rules); Ripon Soc'y, Inc. v. Nat'l Republican Party, 525 F.2d 567 (D.C. Cir. 1975) (rejecting "one person, one vote" challenge to party's delegate allocation formula).

Decisional law, therefore, makes clear that Section 545(D), which purports to govern the allocation and binding of delegates in their voting in contravention of the national party rules (by which Correll has agreed to abide) and which threatens to eliminate altogether Correll's opportunity to participate as a delegate at the National Convention, imposes a severe burden on Correll's First Amendment rights. Section 545(D) cannot survive unless the Commonwealth demonstrates that the statute serves a compelling state interest and, in doing so, is narrowly tailored.

## 2. The Asserted State Interests

Here, the Commonwealth claims "an interest in ensuring that, where a political party selects a state-funded primary election, thereby necessitating the expenditure of significant state and local funds and administrative effort to coordinate a statewide election, and by this choice intimates that the Virginia's [sic] voters will determine the state party's candidate, the political party (or one of its members) does not subsequently cancel out this effort." (Def.'s Resp. 28).

The Supreme Court has rather clearly rejected substantially identical arguments. In Cousins, the respondents proffered a justification substantively indistinguishable from that proffered by Defendants here: that the State has a compelling

interest in "protecting the integrity of its electoral processes and the right of its citizens under the State and Federal Constitutions to effective suffrage." Cousins, 419 U.S. at 489. The Supreme Court flatly disagreed, holding that:

> [c]onsideration of the special function of delegates to such a Convention militates persuasively against the conclusion that the asserted interest constitutes a compelling state interest. Delegates perform a task of supreme importance to every citizen of the Nation regardless of their State of residence. The vital business of the Convention is the nomination of the Party's candidates for the offices of President and Vice President of the United States ... The States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates. If the qualifications and eligibility of delegates to National Political Party Conventions were left to state law 'each of the fifty states could establish the qualifications of its delegates to the various party conventions without regard to party policy, an obviously intolerable result.' Wigoda v. Cousins, 342 F. Supp. 82, 86 (N.D. Ill. 1972). Such a regime could seriously undercut or indeed destroy the effectiveness of the National Party Convention as a concerted enterprise engaged in the vital process of choosing Presidential and Vice-Presidential candidates ... The Convention serves the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State.

Id. at 489-91 (footnotes omitted); see also Anderson v. Celebrezze, 460 U.S. 780, 794-95 (1983) ("[T]he State has a less important interest in regulating Presidential elections than

53

statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.").

The Supreme Court's holding in La Follette further underscores the futility of the Commonwealth's argument. In that case, the Supreme Court held that the Democratic National Convention was free to refuse to seat Wisconsin's entire delegation, thereby rendering meaningless every primary vote cast in Wisconsin, on the ground that Wisconsin's primary process failed to comply with party rules. Although acknowledging the State's interests in "regulating primary elections," the Supreme Court held that no single State's interest in orderly and fair primary elections can justify imposition into the internal workings of the National Convention. La Follette, 450 U.S. at 124, 124 n.28; see also Jones, 530 U.S. at 583 (rejecting the contention that the state's interest in ensuring "the right to an effective vote" was sufficiently compelling to justify a blanket primary for state government elections).

In sum, where the State attempts to interfere with a political party's internal governance and operation, the party is entirely free to "cancel out [the State's] effort" (Def. Resp. 28) even though the state has expanded financial and administrative resources in a primary. E.g., La Follette, 120-

54

22. Furthermore, both Cousins and La Follette lead inexorably to the conclusion that a State's interest in giving effect to primary votes cannot justify burdening the party's right to complete control over the selection of its Presidential and Vice-Presidential nominees, a process in which each individual state has but a fractional stake in a process whose essence includes allocation of delegates and voting rules. Therefore, Defendants have not demonstrated that Section 545(D) serves a compelling state interest.

### 3. Narrow Tailoring

Because Defendants have not demonstrated that Section 545(D) advances a compelling state interest, it is not necessary to address whether the statute is narrowly tailored. Nonetheless, it is significant to note that Defendants have tacitly conceded the point by failing to offer any evidence or argument that the statute is narrowly tailored.

For the foregoing reasons, Correll is entitled to judgment that Section 545(D) is an unconstitutional burden on his First Amendment rights of free political speech and political association. Therefore, the Court so declares and will enter judgment on that score on his behalf on Counts I and II.[27]

---

[27] As previously explained, neither Count IV nor Count V is an actionable count in its own right. Rather, both counts merely state prayers for a specific form of relief. Thus, judgment will

**B.   The Conflict Between Section 545(D) and RNC Rule 16 Creates Unconstitutional Harms to Correll, such that a Permanent Injunction is Equitable**

In establishing entitlement to a permanent injunction, a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). Correll has established each of these requirements.

### 1. Irreparable Injury

It is well established that "[t]he loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. at 353; see also Johnson v. Bergland, 586 F.2d 993, 995 (4th Cir. 1978) ("[v]iolations of First Amendment rights constitute per se irreparable injury"). Moreover, "monetary damages are inadequate to compensate for the loss of First Amendment freedoms." Legend Night Club v. Miller, 637 F.3d 291, 302 (4th Cir. 2011) (citing

---

not be entered on either Count IV or Count V. Instead, declaratory relief will be entered on Counts I and II. The issue of injunctive relief will be addressed in the following section.

Joelner v. Vill. Of Wash. Park, 378 F.3d 613, 620 (7th Cir. 2004)).

Having determined that Correll has prevailed on the merits of his First Amendment claims on Counts I and II, it necessarily follows that he has shown irreparable injury. Neither Defendants nor Intervenors have suggested that a different conclusion should follow if Correll succeeded (as he has) on the merits of those claims.

## 2. Insufficiency of Legal Remedies

Where a state statute inhibits constitutional rights, and its enforcement will deprive of a plaintiff of those rights, the threat to enforce that statute constitutes "a continuing unlawful restriction upon and infringement of the rights" of the plaintiff as to which he has "no remedy at law which is as practical, efficient or adequate as the remedy in equity." Terrace v. Thompson, 263 U.S. 197, 215 (1923) (upholding injunction to end statute's ongoing inhibition of due process rights); Legend Night Club, 637 F.3d at 291 (citing Joelner, 378 F.3d at 620) ("monetary damages are inadequate to compensate for the loss of First Amendment freedoms"); Brinkman v. Budish, 692 F. Supp. 2d 855, 866 (S.D. Ohio 2010) (noting that there "are no available remedies at law that are adequate to compensate for a loss of First Amendment rights."). The absence of effective

remedies at law makes a permanent injunction appropriate in this case.

### 3.   Balance of Equities

The balance of equities also weighs heavily in favor of Correll. Defendants will suffer absolutely no harm if Correll is permitted to vote in accordance with the RNC Rules. Indeed, Defendants explicitly recognize this reality in their brief:

> In this case, so long as the delegates are bound pursuant to the National Republican Rules and the RPV's decision, no evil results in the Commonwealth ... [T]he State's investment in conducting a primary, the voters [sic] investment in voting, and the State's interest in protecting the meaning and integrity of the presidential primary electoral process are all respected so long as the delegates are bound <u>either</u> proportionally or winner-take-all.

(Def.'s Resp. 18) (emphasis added). And, in any event, Defendants are "in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." <u>Legend Night Club</u>, 637 F.3d at 302-03 (citing <u>Joelner</u>, 378 F.3d at 620). Thus, the balance of equities weighs heavily in Correll's favor.

### 4.   Public Interest

The final prerequisite to the grant of an injunction is that the injunction does not disserve the public interest. The Fourth Circuit has repeatedly held that "upholding

constitutional rights serves the public interest." <u>Newsom ex</u> <u>rel. Newson v. Albemarle Cnty. Sch. Bd.</u>, 354 F.3d 249, 261 (4th Cir. 2003); <u>see also</u> <u>United States v. Raines</u>, 362 U.S. 17, 27 (1960) ("there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights[.]"); <u>Legend Night</u> <u>Club</u>, 637 F.3d at 303; <u>Giovani Carandola, Ltd. V. Bason</u>, 303 F.3d 507, 521 (4th Cir. 2002). Therefore, this factor also weighs in favor of granting an injunction.

## III. LACHES DOES NOT BAR CORRELL'S CLAIM

Defendants and Intervenors both assert that Correll's claims and his prayer for injunctive relief are "barred by laches." (Def.'s Answer, ECF No. 24, ¶ 71; Intervenors' Answer, ECF No. 41, ¶ 71). "Laches is an equitable doctrine that precludes relief when a plaintiff has delayed bringing suit to the detriment of the defendant." <u>Perry v. Judd</u>, 840 F. Supp. 2d 945, 950 (E.D. Va. 2012), <u>aff'd</u>, 471 F. App'x 219 (4th Cir. 2012).[28] The doctrine "penalizes a litigant for negligent or willful failure to assert his rights." <u>Id.</u> at 953. "Equity demands that those who would challenge the legal sufficiency of administrative decisions concerning time sensitive public ...

---

[28] At common law, the expression was that a party was "in laches." Common usage today is to plead a bar by the "doctrine of laches." In Fed. R. Civ. P. 8(a), the defense is simply "laches."

projects do so with haste and dispatch." Id. (quoting Quince Orchard Valley Citizens Ass'n v. Hodel, 872 F.2d 75, 80 (4th Cir. 1989)); Marshall v. Meadows, 921 F. Supp. 1490, 1494 (E.D. Va. 1996) ("The Fourth Circuit is especially mindful of laches in the context of an impending vote.").

"Laches requires the proof of two elements: (1) lack of diligence by the party against whom the defense is asserted; and, (2) prejudice to the party asserting the defense." Marcellus v. Virginia State Bd. of Elections, 2015 WL 5285819, at *6 (E.D. Va. Sept. 9, 2015) (internal citations omitted). The Fourth Circuit has held that the first element of laches requires proof that "the plaintiff delayed inexcusably or unreasonably in filing suit." White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990), cert. denied, 501 U.S. 1260 (1991). "An inexcusable delay can only occur after the plaintiff discovers or should have discovered the facts giving rise to his cause of action." Perry, 840 F. Supp. 2d at 953. The second element, prejudice to the defendant, "is demonstrated by a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct." White, 909 F.2d at 102. Prejudice to the defendant must be a result of the plaintiff's delay. Tobacco Workers Int'l Union v. Lorillard Corp., 448 F.2d 949, 958 (4th Cir. 1971). "The greater the delay, the less the

60

prejudice required to show laches." Perry, 840 F. Supp. 2d at 954. Defendants and Intervenors have established the delay requirement, but not the prejudice requirement.

First, Correll's delay in filing suit was unjustified. Virginia's primary election took place on March 1, 2016. Correll, knowing the results of the primary, ran for the position of delegate and was selected on April 16, 2016. Correll then waited ten weeks to file suit until June 24, 2016, leaving less than one month before the 2016 Republican National Convention and allowing over two-thirds of his tenure as a delegate to elapse without prosecuting his time-sensitive claims.

Correll contends that his delay is excusable because he sought to resolve the matter by contacting the Commonwealth's Attorney and the Board of Elections. (Pl.'s Reply 23-24). Understandable though that may be, it does not justify Correll's delay because, having "chosen the non-litigation path," Correll must "live with the consequences." Marshall, 921 F. Supp. at 1494.

Correll also asserts that he could not have brought this action before May 25, 2016, which was "the date that Trump obtained sufficient presumptive delegates to lock a presumptive first-ballot victory," because "any vote that Correll cast for Trump on that ballot would have been inconclusive" unless Trump

was the presumptive nominee. (Pl.'s Reply 23). That argument is simply inconsistent with Correll's theory of the case. The conflict between Section 545(D) and the RNC Rules, which is the basis of Correll's alleged injury, existed on the date that Correll became a delegate and is entirely unrelated to the issue of whether the first ballot at the National Convention will or will not be "conclusive." Therefore, Correll has failed to justify his delay in bringing this action.

The second element of laches requires that Defendants have suffered prejudice as a result of Correll's unjustified delay. Defendants claim that they will suffer "financial and administrative prejudice" because, "[b]y requesting a remedy that would allow all Republican delegates to disregard the primary vote and 'vote their conscience,' Plaintiff seeks to render the Commonwealth's financial and administrative investment a waste and deprive the Commonwealth of the consideration for the Commonwealth's expenditure of resources in holding the primary." (Def's Resp. 12-13). Defendants assert that such relief would undermine their "'legitimate governmental interest in ensuring the fairness of the party's nominating process[.]'" (Def.'s Resp. 13) (citing Lopez-Torres, 552 U.S. at 202-03). Defendants also contend that Correll's delay "causes great prejudice to the public – specifically, the more than one

million Virginia voters who participated in that primary."
(Def.'s Resp. 13)

However, Defendants' arguments fail because neither of the prejudices that they have identified is attributable to Correll's delay in pursuing this action. Correll became a delegate, and therefore became subject to Section 545(D), on April 16, 2016. Because Section 545(D), which purports to regulate the conduct of delegates elected to represent Virginia at the National Convention, did not apply to Correll before he became a delegate, he did not have standing to bring this action before he was selected.[29] As of April 16, 2016, the Commonwealth had already expended the financial and administrative resources necessary to conduct the Republican presidential preference primary (which occurred on March 1, 2016), and the voters' ballots had already been cast. Therefore, the Commonwealth would not have avoided the costs of the primary even if Correll had brought this action on the first day he had standing to do so. Accordingly, any prejudice that Defendants have suffered cannot

---

[29] For that reason, Defendants' repeated contentions that Correll should have brought this action before the March 1, 2016 primary are simply incorrect. Correll could not have challenged a statute that allegedly impinges on the First Amendment rights of delegates when he was not a delegate.

be traced to Correll's delay, and the affirmative defense of laches does not apply.[30]

The Intervenors employ a slightly different theory or prejudice, arguing that Correll's late-filed suit is sowing chaos on the eve of the 2016 Republican National Convention. (Tr. Jul. 7, 2016 216:12-16, 220:12-222:6; Intervenors' Resp. 8). However, that argument is directed to Correll's RNC Rule 38 "conscience" theory, which the Court, as discussed earlier, lacks jurisdiction to adjudicate. The Intervenors do not assert prejudice so long as Correll's theory is limited to the conflict between RNC Rule 16 and Section 545(D). (Tr. Jul. 7, 2016 215:15-19, 216:22-220:15).

## CONCLUSION

For the foregoing reasons, judgment will be entered in Correll's favor on Counts I and II and the Commonwealth will be permanently enjoined from enforcing **Va. Code** § 24.2-545(D).

There is no need to enter judgment on Counts IV or Count V because they are prayers for relief, not claims upon which relief can be granted. Correll put on no evidence as to Count

---

[30] In any event, allowing Correll to vote as required by the National Rules and RPV's 16(f) Filing, which mandate that Virginia's delegates vote proportionally on the first ballot in accordance with the results of the primary election, will not result in the prejudice that Defendants fear. Indeed, Defendants acknowledge that, "so long as the delegates are bound pursuant to the National Republican Rules and the RPV's decision [to allocate votes proportionally], no evil results in the Commonwealth." (Def.'s Resp. 18).

III and did not argue it. Thus, Count III will be dismissed with prejudice.

It is so ORDERED.

_____/s/_____REP_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 11, 2016